793 A.2d 645

IN THE MATTER OF JAMES A. BRESLIN,
JR., AN ATTORNEY AT LAW.

Argued September 24, 2001—Reargued February
25, 2002—Decided March 28, 2002.

236

*Richard J. Engelhardt,* Assistant Ethics Counsel, argued the cause on behalf of the Office of Attorney Ethics.

*Michael P. Ambrosio,* argued the cause for respondent.

The opinion of the Court was delivered by

STEIN, J.

For a lawyer, a judgment of disbarment is the ultimate professional sanction. Because in New Jersey disbarment invariably is permanent, a disbarred lawyer cannot ever again expect to practice his chosen profession. The enormity of that consequence has caused the members of this Court to treat disbarment matters with exceptional care and meticulous scrutiny.

The members of the Disciplinary Review Board (DRB) were evenly divided on the question of discipline. Four members of the DRB recommended that Respondent be disbarred. Three members recommended a three-year suspension and one member recommended a reprimand. In our view, however, the four-member DRB disbarment recommendation relies too literally on *Rule* 1:20–14(c) which states, in effect, that a judicial disciplinary proceeding conclusively establishes the conduct on which discipline was based for purposes of any subsequent attorney disciplinary proceeding. In this matter, however, the difference in the standards governing judicial discipline from those governing attorney discipline requires the Court to go beyond the findings of the three-judge Panel that recommended Respondent's removal from the bench and focus comprehensively on the actual evidentiary record.

## I

Respondent, James A. Breslin, Jr., a member of this State's bar since 1968 and the judge of the Lyndhurst Municipal Court since 1978, had an unblemished ethics record prior to these proceedings. The matter before us originated as a Presentment filed by this Court's Advisory Committee on Judicial Conduct (ACJC), after a hearing, in which the ACJC by a 6–3 vote recommended that this Court institute proceedings to remove Respondent from his judicial office. The ACJC majority found by clear and convincing evidence that Respondent's failure to report a bribe attempt to law enforcement authorities violated Canons 1 and 2A of the *Code of Judicial Conduct.* Canon 1 provides:

> **1. A Judge Should Uphold the Integrity and Independence of the Judiciary**
> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.

Canon 2 entitled **"A Judge Should Avoid Impropriety and The Appearance of Impropriety in all Activities"** provides in part:

> A. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

The ACJC also found by clear and convincing evidence that Respondent's conduct was prejudicial to the administration of justice, contrary to *Rule* 2:15–8(a)(6), which provides:

> **2:15–8. Initial Review By Committee**
> (a) The Committee shall review any written statement, criticism or grievance that is directed to the Committee and that contains allegations to the effect that a judge of the Superior Court, Surrogate's Court, Tax Court or Municipal Court is guilty of:
>
> . . . .
>
> (6) conduct prejudicial to the administration of justice that brings the judicial office into disrepute.

One member of the ACJC agreed with the Committee's findings but recommended a sanction short of removal. Two members, one a retired Associate Justice of this Court and the other a present member of the Court not participating in this appeal,

agreed that Respondent's failure to report the bribe violated Canons 1 and 2A, but disagreed with the Committee's finding that Respondent's own testimony "comes very close to constituting clear and convincing evidence of participation in bribery." Those members recommended censure rather than removal.

In response to the ACJC's Presentment, this Court convened a three-judge Panel that conducted two days of evidentiary hearings, and also received in evidence essentially the same exhibits that had been offered in the ACJC proceeding. The Panel found beyond a reasonable doubt that Respondent's failure to promptly report the bribe attempt to law enforcement officials violated Canons 1 and 2A of the *Code of Judicial Conduct* as well as *Rule* 2:15–8(a)(6) (describing conduct prejudicial to the administration of justice). The Panel made additional findings to the effect that the manner in which Respondent reported the bribe attempt to Paul Haggerty, his close friend of twenty-five to thirty years and the Lyndhurst Police Commissioner, also violated Canons 1 and 2A of the *Code of Judicial Conduct.* The Panel recommended Respondent's removal from office. He subsequently tendered his resignation, which this Court accepted by order dated January 14, 2000.

Based on the Court's order, the Office of Attorney Ethics (OAE) petitioned the Disciplinary Review Board for discipline of Respondent as an attorney, seeking Respondent's disbarment on the basis of alleged violations of various *Rules of Professional Conduct* (*RPC*). None of the alleged *RPC* violations had been the subject of either the ACJC's or the three-judge Panel's determinations. The alleged *RPC* violations were the following:

*RPC* 1.2 SCOPE OF REPRESENTATION

(d) A lawyer shall not counsel or assist a client in conduct that the lawyer knows is illegal, criminal or fraudulent, or in the preparation of a written instrument containing terms the lawyer knows are expressly prohibited by law, but a lawyer may counsel or assist a client in a good faith effort to determine the validity, scope, meaning or application of the law.

(e) When a lawyer knows that a client expects assistance not permitted by the *Rules of Professional Conduct* or other law, the lawyer shall advise the client of the relevant limitations on the lawyer's conduct.

*RPC* 4.1 TRUTHFULNESS IN STATEMENTS TO OTHERS

    (a) In representing a client a lawyer shall not knowingly:

. . .

    (2) fail to disclose a material fact to a third person when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client.

*RPC* 8.4 MISCONDUCT

    (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

    (d) engage in conduct that is prejudicial to the administration of justice;

    (e) state or imply an ability to influence improperly a government agency or official[.]

A majority of the DRB concluded that Respondent's conduct violated *RPC* 8.4(c) and (d), although the DRB decision did not specify that aspect of Respondent's conduct on which it relied to establish the *RPC* violations. As noted, four members of the DRB recommended disbarment; three members recommended a three-year suspension; and one member recommended a reprimand.

II

Notwithstanding that our Rules of Court provide for reciprocal discipline of attorneys based on judicial discipline, *R.* 1:20–14(c), and state that the "[judicial discipline] proceedings shall be conclusive of the conduct on which the discipline was based in any subsequent disciplinary proceeding," fairness to Respondent compels us to focus on the evidence in the record, not on the findings of the three-judge Panel. That Panel's findings were based on violations of the *Code of Judicial Conduct* (Canons 1 and 2A), and on *Rule* 2:15–8(a)(6) (describing conduct prejudicial to administration of justice that brings judicial office in disrepute), not on the *RPC* violations on which the DRB based its recommendation for disbarment.

We note that the standards governing judicial behavior, on which the three-judge Panel relied to sustain its findings, are generalized principles that attempt to define appropriate judicial conduct. *Cf.* Canon 2 ("A judge . . . should act . . . in a manner that promotes public confidence in the integrity and impartiality of the judiciary.") Although the Panel applied a "reasonable doubt"

standard of proof, the generalized criteria that controlled its determination did not require precise and specific findings of fact. In comparison, the finding by the DRB majority that Respondent "engage[d] in conduct involving dishonesty, fraud, deceit or misrepresentation" is a more precise and specific determination than that reached by the Panel. The significant difference in the specific quality of the conduct required to sustain the *RPC* violations, as compared with the more generalized standard implicated by the Canons and the related Rules, require this Court to conduct a painstaking *de novo* reexamination of the underlying record, just as it does in other attorney disciplinary matters in which the initial hearing is held before a District Ethics Committee.

### A. Testimony of Respondent

In addition to Respondent's live testimony before the three-judge Panel, two exhibits were admitted, one containing a summary of an interview of Respondent, and the other containing a verbatim transcript of Respondent's testimony at a deposition conducted by ACJC staff members.

1. Exhibit C–1 in evidence before the hearing panel was Investigator Randazzise's report of her interview of Respondent on December 26, 1996. The material portion of that report read as follows:

> Mr. Breslin stated that in the latter half of October 1996, Joseph Ciardella of Toms River, New Jersey, a former legal client, came to his law office located at 296 Ridge Road, Lyndhurst, N.J. (201–939–8760). At that time he gave him a manila envelope. Mr. Ciardella told him that the envelope contained his son's resume for the Lyndhurst Police Department. Mr. Breslin stated that Mr. Ciardella asked him to give the resume to the Lyndhurst Police Commissioner, Paul Haggerty. Mr. Breslin stated that Mr. Ciardella had stopped in at his office around lunchtime, without an appointment. Mr. Breslin stated that he was on his way to court in Hackensack, so he took the envelope, put it either on his desk or next to his desk and left for court. He stated that when he returned to his office, he looked in the envelope, found the resume, and two bank envelopes that contained money. Mr. Breslin stated that neither the large manila envelope nor the two bank envelopes had been sealed. He stated that he went to Paul Haggerty to speak to him about this matter. Mr. Breslin stated that Mr. Haggerty's reaction to his matter was that, given the current political climate in Lyndhurst, someone was out to get him.

Mr. Breslin stated that Mr. Haggerty did not want the manila envelope and stated that he was going to the Prosecutor's Office. Mr. Breslin retained the manila envelope, resume and the two bank envelopes containing $10,000 in U.S. Currency. He stated that during the time that he was in possession of these items he left them in his desk in his locked office.

Sgt. Randazzise's summary also indicated that Respondent had twice performed legal services for Joseph Ciardella, once in the 1970's when Ciardella hired him to change his name from Joseph DuBois to Joseph Ciardella. The second matter occurred in about 1994 when Respondent was retained by Ciardella in a will contest proceeding. Respondent stated that that matter had been successfully resolved about a year prior to the incident in question.

Respondent also informed Sgt. Randazzise that prior to Ciardella's unannounced visit, Ciardella had telephoned Breslin asking if there were vacancies in the Lyndhurst Police Department. Respondent stated that he informed Ciardella that no new hiring was occurring at that time.

2. Exhibit C–10 is a transcript of a deposition of Respondent taken by Patrick J. Monahan, Jr. and John Tonelli on behalf of the ACJC.

The following excerpts from that deposition have a direct bearing on the matter before the Court:

Q. As the Committee understands it Mr. Ciardella came to your office some time in October of 1997, is that when it occurred?

A. Approximately, yes.

Q. Okay. Is there any way you can reconstruct the exact date?

A. '97, '96 I think.

Q. '96? Did I say—

A. Yes.

Q. —'97, my mind—I'm—sorry. Is there any way you can construct if not the exact date, the time of the month that he visited you?

A. No, not really. Maybe the middle of the month.

Q. Okay. Did you know he was coming?

A. No.

Q. Had you had any conversations with him, since your last representation of him?

A. Yes.

Q. Did you socialize with him?

A. No.

Q. Now, the Committee understands that you represented or handled matters for Mr. Ciardella on a couple of occasions, correct?

A. Yes.

Q. One in the sixties, and one more recent one an estate matter, is that right?

A. Correct.

Q. Now. What conversations did you have with Mr. Ciardella after you handled the second matter?

A. He would call me on the phone, and he was originally from Lyndhurst. And he moved to Toms River. He'd keep up I guess on the local goings on in Lyndhurst, call me up, what's going on. I guess—it seemed to me he was getting a local paper, the Lyndhurst paper down in Toms River, and just call me about what's going on in town.

Q. So it was not a business conversation?

A. No.

Q. Did he at any time indicate to you that he wanted to get his son a job with the municipality?

A. Yes.

Q. And when did he make that indication?

A. In terms of time, I really couldn't tell you.

Q. Can you say whether it was a year before he visited you, or longer?

A. No. Three, four months maybe.

Q. Did he ask you to help him get his son a job with the municipality?

A. Not directly no.

Q. What did he say?

A. He—he wanted to know how—how to go about having his son apply to become a police officer.

Q. And what did you tell him?

A. That you had to go to the Town Hall and see the Chief of Police, who had applications.

Q. What was his response to that?

A. Okay. And he—I gave him the information and then that was the end of it.

Q. Did he say what particular types of jobs he wanted for his son?

A. No.

Q. So it was open ended?

A. Open ended in what fashion?

Q. That is to say Mr. Ciardella didn't tell you that he wanted a specific type of municipal job for his son?

A. Yes. He told me he says, his son wanted to become a police officer.

Q. And that was the only thing then?

A. Right.

Q. Was it mentioned in terms of a job with the town?

A. Correct.

Q. Okay. Now the day he visited you, you had no idea he was coming?

A. Correct.

Q. What time of day did he come to your office?

A. It's around—I'm almost positive it was around lunchtime, 12 O'clock, 12:15 something like that.

Q. What makes you positive?

A. Because I was on my way out, I'm almost sure I had Court on that Thursday. And I was late, and I was like rushing out the door and he was coming in.

Q. When you say you had Court, you mean to sit?

A. Yes.

Q. And what happened when he arrived?

A. I said to him, "you know, what do you want I says, I'm late, I've got to go." And he says, "Here give this to the Commissioner." And he gave me an envelope.

Q. Did you open it?

A. Not that time, no.

Q. At what time did you open it?

A. Two days later, three days later.

Q. But going back to when he visited your office, what was said next after he gave you the envelope?

A. Nothing. Nothing. It was like I left.

Q. He walks into your office, says here's an envelope for the Commissioner, didn't identify the Commissioner?

A. No.

Q. You say, "I'm going" and you leave, that's it?

A. That was it. Like seconds.

Q. Where did you put the envelope when he handed it to you?

A. On my desk.

Q. Did he tell you what was in it?

A. No.

Q. When did you next see the envelope?

A. Well—I know it was a weekend, it was like a couple of days later, Saturday or Sunday.

Q. Now how did you come to see the envelope? On the weekend?

A. I—well I'm normally there on the weekend, but—I picked up the envelope to look at the resume. I read the resume.

Q. Did you see anything else in the envelope?

A. Not when I pulled the resume out. When I tried to put it back in, I couldn't get it back in.

Q. Why couldn't you get it back in?

A. As it turned out there were two bank envelopes with money in it, sitting at the bottom of the envelope.

Q. What was your reaction?

A. Shock.

Q. What if anything did you do when you saw the envelopes?

A. Pulled them out of the—the manila envelope, and looked in them.

Q. So we're talking about a nine by 12 manila envelope, containing—

A. Yeah.

Q. —a resume and two bank envelopes?

A. Right.

Q. Did you tell anyone that you found them at that time? Did you call Ciardella?

A. No.

Q. Did you call the Commissioner?

A. At that time, no.

Q. When did you tell the Commissioner what you found?

A. Monday. I believe it was Monday or Tuesday.

Q. On that Thursday, which you think it probably was, after you got the envelopes, you went to Court did you see the Commissioner that day?

A. I don't recall.

Q. When we talk about the Commissioner who are we talking about?

A. At that time it was Commissioner Haggerty.

Q. Paul Haggerty?

A. Right.

Q. Did you see him that Friday, the day after you got the envelope?

A. I don't think so. Could be.

Q. If you did see him, did you mention?

A. I believe the first time I saw him after I got the envelope and realized what was in it, I told him.

Q. But you didn't realize what was in it until Saturday?

A. Right. And like I said I don't think I—

Q. Let's go to Monday then, which is the day you think you told Haggerty what you'd gotten. Where did you have this communication with Haggerty?

A. Restaurant in Lyndhurst.

Q. What's the name of the restaurant?

A. La Cibeles.

Q. You know how to spell that?

A. L-a-c-i-b-e-l-e-s, I think.

Q. And was that a planned meeting with him?

A. No.

Q. Did you regularly meet him at Lacibeles?

A. Probably three times a week. Either one of us would run into each other.

Q. It was your habit to go to Lacibeles?

A. Yeah, he lives a block away from there, I guess.

Q. Did you have dinner with him there?

A. On that night?

Q. Yeah, on that night? Okay. So exactly what happened from the time you arrived at Lacibeles Restaurant?

A. You know, I—at that point I'm saying to myself he's not really involved other than they said to give it to the Commissioner. I have the money, and I just kind of gave him a hypothetical what would you do if, you know, you were in this position. And he must have picked up right away, as to what I was trying to tell him, because he said, don't tell me, I don't want to know nothing about it. Because nothing happened to me in effect. And I'm the guy that's involved. And that was the end of the conversation that night.

Q. Now, let's just stick with that night for just a minute please. Was he there when you got there?

A. I don't recall.

Q. Where were you sitting with him, when you had this conversation?

A. At the bar I believe.

Q. Oh, so you occasionally run into him at the bar there?

A. Correct.

Q. Was this part of a group?

A. Yeah.

Q. There were others in the group?

A. Yes.

Q. How many others?

A. Any given night, I don't know, eight, 10 guys, same guys.

Q. Was this a planned kind of event?

A. No.

Q. Was there anybody there who overheard you talking to Haggerty when you told him about it?

A. I doubt it.

Q. Can you try and reconstruct exactly what you said to Haggerty, when you broached the subject?

A. I—like I said, I turned it into a hypothetical, what would you do if somebody gave you some money and asked for a favor, basically.

Q. When you were telling him that, were you more specific? By that I mean did you tell him what would you do if somebody gave you money and asked for a favor about getting somebody a job on the police force?

A. I don't think so.

Q. So he didn't know what you were talking about?

A. No.

Q. And yet he said, "doesn't involve me."

A. Exactly.

Q. Did you continue with the subject?

A. No, dropped it right there.

Q. Okay. What—what's the next event in this sequence?

A. I'm not sure if he—he called me or I called him, and anyway we met there again. And I told him what happened. The real story.

Q. How much after the Monday was this?

A. Couple of days maybe.

Q. But you called him from your office?

A. I may have. Or he called me.

Q. I'm sorry—

A. I'm not sure. I don't remember who called who, but I'm pretty sure there was a phone call.

Q. Saying let's get together?

A. Yeah.

Q. At Lacibeles? What-what I'm trying to do here, Judge, is-is clarify how the meeting came together, and I understand that you can't recall whether you called him, or he called you. It is understandable if you called him, you might say Paul, something I want to talk to you about. What I'm trying to understand the other part of the equation, if he called you? Then what would have prompted him to call you? If you know?

A. I don't know.

Q. In between these two times, namely the meeting at the restaurant probably that Monday, and the telephone call setting up this second I wouldn't say appointment, meeting, had you had any conversations with him that you recall?

A. No.

Q. All right, so did you then go ahead and meet a second time, a couple of days later?

A. Yes.

Q. And where was that?

A. Lacibeles.

Q. What happened then?

A. I explained to him exactly what happened.

Q. What was his response?

A. He—he had no knowledge who Mr. Ciardella was, and he couldn't understand why he was coming to me.

Q. Did you explain why—did you explain to Haggerty the relationship between you and Ciardella?

A. Yes.

Q. Did he then understand why he'd gone to you?

A. Yes.

Q. What was Haggerty's general response to the whole affair?

A. He said something to the effect that well, it looks like he's trying to get both of us in trouble.

Q. Do you know of any motivation that Ciardella would have to get either of you in trouble?

A. None whatsoever.

Q. Do you have any idea why Haggerty would have said something like that?

A. No.

Q. Was there anything else to the conversation between you and Haggerty that—that second occasion? A. No, other than he said he would—he really didn't know what to do so—I said, "we've got to report it, just as I reported it to you you're my boss. Now we've got to go another step further, and I don't know who you—who you report to." And he says, "Well, he'll bring it to the County Prosecutor."

Q. Okay. Did he know the County Prosecutor?

A. Well the County Prosecutor I'm referring to was in—at that time was running our Police Department. He was on loan from the County of Bergen, and he was running our Police Department.

Q. Do you recall his last name?

A. Tolbin (phonetic).

Q. So what happened next?

A. He told me he would report it to Tolbin. And that somebody would be in touch with us.

\*  \*  \*  \*  \*  \*  \*  \*

Q. Did you have any further conversations, with Haggerty other than the ones you've described, before you finally gave the money up? Before you finally— handed the money over to the Prosecutor's Office?

A. Like every couple of weeks. He'd ask me did you hear from the Prosecutor, I said, no. I said did you? He says no.

Q. Had he told Tolbin by that time?

A. Yes.

Q. Do you know when he told Tolbin with reference to your—

A. It seemed to me it was a couple of days later.

Q. Did he tell you—did Haggerty tell you what Tolbin said to him?

A. Other than-no nothing specific, other than the County was now going to handle it.

Q. When did you finally give the money to the Prosecutor's Office?

A. December.

Q. Wasn't that the day after Christmas?

A. The 26th, yes.

\*     \*     \*     \*     \*     \*     \*     \*

Q. And after you reported this to Commissioner Haggerty, you were then waiting for the Prosecutor's Office to contact you, is that correct?

A. Correct.

Q. And when the Prosecutor's Office finally did contact you did you make arrangements to immediately go down to the Prosecutor's Office, and turn the money over to them?

A. Yes.

Q. Did you also tell the Prosecutor's Office you would cooperate in any manner that they wanted you to, with whatever investigation they were conducting?

A. They wanted to put a wire on me. And I said it was—

Q. Are you—

A. —fine with me.

Q. And you were ready, willing and able to cooperate by recording any conversations they wanted you to record with anyone? Is that correct?

A. That's correct.

Q. Did they ever ask you after you voiced your willingness to do so, to—to wear a wire?

A. They—well it's my understanding that they researched the matter and said, well whatever I get from Mr. Ciardella on a wire be considered attorney/client privilege.

Q. And so the answer is no?

A. So the answer is no, in the meantime they threw me away, and they put the wire on Mr. Haggerty.

\*     \*     \*     \*     \*     \*     \*     \*

Q. Is there anything in retrospect you'd do differently, if you had it all to do over again?

A. I would—yes I wouldn't have—I shouldn't have considered Mr. Haggerty as my boss, although he is my boss. I would have found another boss.

Q. To do what?

A. To report it to. But under the Commission form of Government, he's my boss.

Q. Because he's Director of Public Safety?

A. Correct.

*    *    *    *    *    *    *    *

Q. Okay. Besides Haggerty being your stockbroker, what—could you describe what your relationship is with him?

A. I've known him for 30 years. His—his father-in-law and my father were Assistant Prosecutor's together in Bergen County at some point in time, so. His family and my family have been friends forever.

Q. So would you consider him a close personal friend?

A. Yeah.

Q. Given that background, can you try to explain to me why the first time you spoke to Haggerty did—you just didn't come right out and tell him what had happened, you used the—hypothetical—

A. Hypothetical.

Q. —situation?

A. Because I didn't—I didn't want to get him involved, if I didn't have to. Because the guy's approaching me, even though he's telling me to give it to the Commissioner, I'm saying well why should I get him involved. I mean just deal with it myself here, rather than getting him involved, if I didn't have to.

Q. Okay, and—and what—what prompted you after that initial conversation to then have another conversation with Haggerty when you laid it all out on the line rather than taking some immediate action yourself, with the Prosecutor's Office?

A. Because I—I was like still stunned for a couple of days, I'm thinking, what did I do now, what did I do now, like I said, I'm not sure—I'm not sure if he called me, or I called him, but I know one of us then said, I guess, somebody's got to tell the whole story here.

MR. MONAHAN: Excuse me, when did the name Ciardella enter the picture in your conversations with Haggerty?

JUDGE BRESLIN: When I finally told him about the money. You know, within a couple of days after I guess.

MR. MONAHAN: Okay. So the first time that Monday probably, you said, here's the hypothetical situation, he says hear no evil, see no evil in effect? Then a couple of days later, you meet again, and that's when you reveal to him the name of Ciardella when you're giving the—

JUDGE BRESLIN: I believe so.

MR. MONAHAN:—the—does he say anything when you say Ciardella?

JUDGE BRESLIN: No, he said, "That doesn't mean a damn thing to me." I says, "Well it probably shouldn't," I says, ". . . because he lives in Toms River." And he says, "Well where did his son live." I says, "To be honest with you, I guess he lives in Lyndhurst, but I don't even know him."

MR. MONAHAN: Did you get a feel for Haggerty's reaction to this whole thing?

JUDGE BRESLIN: Outrage.

MR. MONAHAN: You said something earlier, here's why I'm asking this question, you said something earlier about him saying to you, "It looks like they're trying to take us both down."

JUDGE BRESLIN: Correct.

MR. MONAHAN: Now, was he under any kind of political fire that somebody would be trying to take him down?

JUDGE BRESLIN: A thousand percent at that time yes. Much fire.

MR. MONAHAN: A political faction, or from individuals?

JUDGE BRESLIN: I—the best way I can explain it, is Chief of Police resigned, or retired, Haggerty appointed somebody in his place. That offended one—one faction. Who then has the Chief of Police before he resigns, appoint the other faction as the Chief. So now—Haggerty appointing one Chief, and the Chief of Police resigning, appointing another Chief, so there's a battle. He goes to the Attorney General's Office, and that's—they go to the County, who then puts their own man in there, until it's straightened out. At that point, the—it was one faction fighting Haggerty, completely day in and day night. Even until today. There's a Federal lawsuit still going on, between this one faction, Haggerty and the Town.

MR. FLOOD: Who's suing whom?

JUDGE BRESLIN: Fellow that was a Deputy—Deputy Police Chief, is suing Haggerty and the Town of Lyndhurst for violation of his Federal Civil Rights.

MR. FLOOD: Because he didn't get the job?

JUDGE BRESLIN: Correct. Haggerty thought this fellow was the one that set both of us up.

&ast; &ast; &ast; &ast; &ast; &ast; &ast; &ast;

MR. TONELLI: Can you give us a—a time frame as to your understanding of when the Prosecutor's Office found out about this from Haggerty, do you have any idea as to what time frame we're talking about?

JUDGE BRESLIN: A week or two after I got the envelope, that was my understanding.

MR. TONELLI: So we're talking the end of October, or early November? Some time in—

JUDGE BRESLIN: The Prosecutor's Office, meaning—

MR. TONELLI: Tolbin.

JUDGE BRESLIN: Mr. Tolbin who was in Lyndhurst, yeah.

MR. TONELLI: Right. Right. And you didn't turn the envelope over until December 26th, which is almost two months after—

JUDGE BRESLIN: Correct.

MR. TONELLI:—the Prosecutor's Office, through Tolbin was informed? Did there ever come a point in time, during that two month stretch where you thought to yourself, hey I don't know what's going on, nobody's contacted me, maybe I should give a call to the Prosecutor's Office, and see what's happening?

JUDGE BRESLIN: No, but—well, I got very panicky after a while. I'm saying, what the hell is going on. I figured well maybe some day in the paper I'll pick it up, the guy's arrested, but—near the end I was like—I didn't know what to do.

MR. TONELLI: Did the Prosecutor's Office offer any explanation as to why it took them so long to contact you?

JUDGE BRESLIN: Not to me, no. Maybe they did to Mr. Flood, I don't know.

3. Respondent testified before the three-judge panel on October 1, 1999. He was first questioned by his counsel, Raymond Flood, and was then cross-examined by Assistant Attorney General, Jeffrey Miller. The following are relevant excerpts from his examination and cross-examination.

DIRECT EXAMINATION BY MR. FLOOD:

Q. Judge Breslin, what's your date of birth?

A. December 21, 1942.

Q. And when did you graduate from law school?

A. 1968.

Q. And when were you admitted to practice law?

A. 1968.

Q. Are you married?

A. Yes, sir.

Q. Just briefly tell us about your family.

A. Four children, three grandchildren.

Q. And did you open a practice of law after being admitted to the Bar?

A. Yes, sir.

Q. And where was that office?

A. The same office I am now, Ridge Road, Lyndhurst.

Q. And did there come a time when you became appointed the Municipal Court Judge in Lyndhurst?

A. 1978.

Q. Now, Joseph Ciardella, did you perform some legal work for Mr. Ciardella?

A. First time was in the early '70s.

Q. Do you recall what the nature of the legal work was that you performed?

A. Mr. Ciardella was, at that time his name was DuBois, D–U, capital B–O–I–S. He was getting married and he wanted his stepfather to adopt him prior to getting married. So then the offspring could be his stepfather's, in effect, grandchildren.

Q. And by the way, did you ever go to school with Mr. Ciardella?

A. No, sir. I didn't even go to school in Lyndhurst, except for a couple of years.

Q. Where did you go to school?

A. Summit.

Q. Now, did you perform any other legal work for Mr. Ciardella after the name change?

A. Yes. I believe it was maybe a couple years prior to this incident. I handled, had an estate matter for Mr. Ciardella.

Q. And do you recall briefly what you did pertaining to that legal matter?

A. The last heir of the Ciardella family died leaving an estate of, I don't know how much it was. Mr. Ciardella figured since he was a Ciardella, he was entitled to his share of the estate.

Technically, he was not blood related, he was not a blood related Ciardella, he just legally changed his name to Ciardella. He wanted me to sue the estate to get his share of the estate money.

Q. Now, do you know Paul Haggerty?

A. Yes, sir.

Q. How long have you and Mr. Haggerty known one another?

A. The early '60s.

Q. And what has been the nature of your relationship with Mr. Haggerty?

A. Very close.

Q. How often would you see Mr. Haggerty on a weekly basis?

A. Well, when he was police commissioner, he lived in the town hall, so any time I was down there, I saw him almost daily down at the town hall. The police were in the court two or three times a week now, I guess.

Q. Are you familiar with the way he conducted himself as a commissioner?

A. Yes, sir.

Q. And how would you describe the way Mr. Haggerty conducted himself when doing anything of a public nature?

A. Honest, straightforward. He was the only police commissioner that I worked under that actually cared about the department, that put any time in on it.

Q. Are you aware of an incident when he was on the Board of Education involving an attempt to have someone influence his vote on a matter of some importance?

A. Yes, sir.

Q. How were you aware of that?

A. He—I heard it from other people, but he also told me. It was kind of common knowledge in town.

Q. But he had told you personally that someone had attempted to give him money?

A. Correct.

Q. And that he absolutely would have nothing to do with that kind of misbehavior?

A. Yes, sir.

Q. No question you were aware of that?

A. No, I was aware of it.

Q. Now, I would like to invite your attention to the end of October 1996. Do you recall an incident where Mr. Ciardella came to your office?

A. Yes, sir.

Q. Did Mr. Ciardella have an appointment to see you that day?

A. No, he didn't.

Q. Were you expecting to see him?

A. No.

Q. When he showed up at your office, where were you going at the time?

A. I was on my way out to go to court, Municipal Court. It was a Thursday.

Q. Tell the Court what happened when Ciardella showed up in your office.

A. He walked in, and I, I was maybe a quarter of the way out of my office, going out with a bunch of papers, and all—he just said: Here's an application for the police department. Give it to the Commissioner.

Q. What did you say to Mr. Ciardella at that time?

A. I really didn't say anything. I didn't expect him, I didn't know what he was giving this to me for. I just took it from him, put it on my desk, and ran out. I was late.

Q. How long would you estimate that Ciardella was physically in your office when you were there with him?

A. In my presence? Thirty seconds, a minute, a minute and a half.

Q. Was there, would you consider it a very brief encounter?

A. Yes.

Q. Now, with respect to the envelope that Ciardella left in your office, what did you do with it?

A. Put it on my desk.

Q. When did you next physically examine that envelope and its contents?

A. It was either the next couple, like, Saturday or Sunday, I'm not sure when it was, a day later, two days later.

Q. Tell the panel what you did.

A. I opened the envelope and pulled out the application for the police department, just looked at it for a couple of pages, and tried to put it back into the envelope.

Q. Then what happened?

A. It wouldn't fit.

Q. Why wouldn't it fit?

A. I looked inside, there were two bank envelopes containing money.

Q. What did you next do?

A. Like I said, it was either Saturday or Sunday. On Monday, I went to find Mr. Haggerty to report the incident to him since he was, in effect, the chief, or in charge of public safety, my, my department.

Q. What was your understanding as to the role and responsibilities that the police commissioner had vis-a-vis the Lyndhurst Police Department and the Lyndhurst Municipal Court in 1996?

A. Mr. Haggerty was, in effect, in charge of the police department, the Municipal Court of which I was the judge, the fire department, and he was the sole man to talk to concerning the court or the police department.

Q. Tell the Court what you did.

A. I went to him, saw his car, I was going to his house, but I saw his car in LaSobella's Restaurant.

Q. Is LaSobella's on the way to Mr. Haggerty's house?

A. Yes.

Q. Please continue.

A. I went inside, it was just Mr. Haggerty there. And I said to him—well, I guess I said good evening or something, but anyway, I said to him: What would you do if somebody gave you money to have their son appointed as a police officer?

Q. What were you attempting to do? And tell the Court why you started the conversation off that way.

A. Well, as soon as I saw the money, I—and he said give it to the Commissioner, I knew it was a bribe. I was going to Mr. Haggerty to report it to him.

Q. Please continue. What else happened?

A. Well, after I gave him the question, he got very indignant and angry and started screaming, just about.

Q. Were you able to continue talking to him at that time?

A. After his response, somebody walked in that knew us and said something to the effect that, are you guys arguing, and sat down next to us. So I certainly wasn't going to continue the conversation at that point.

Q. What else happened?

A. The next, the next time I saw Mr. Haggerty was two days—I waited for a day to go by. I says, I'm going to go back to him the following day and tell him the name of the person and exactly what happened, and I'm going to tell him I'm going down to the police station to report it.

Q. Did you see Mr. Haggerty again that week?

A. Two days later.

Q. How often would you and he get together in a typical week?

A. Two or three times a week.

Q. Tell the Court what you said and what you recall Mr. Haggerty saying to you the second time you went to report this to him.

A. The second time I told him exactly who the person was, what happened. His response was something to the effect that they're trying to take us down, the club was out to get him. And I said, well, I reported this to you. Who are we going to go through now. I said we got to go to somebody else, so tell me who we'll go to. He said, we'll go to Mr. Tobin who was in charge of, or acting chief at the time and who was working for the Prosecutor's Office.

Q. And did Mr. Haggerty say that he would report it on behalf of both of you to Mr. Tobin?

A. That's correct.

Q. Were you in complete accord that this should be done?

A. Yes. I told him that we had to report it to somebody else other than him.

Q. Now, you also indicate that you were ready, willing and able to cooperate with an investigation and to turn the money in.

A. Yes; I had the money locked in my office.

Q. Now, did you have any other conversations with Mr. Haggerty pertaining to what, if anything, the Prosecutor's Office was doing about what had been reported to them?

A. After the second meeting or maybe a week went by, I didn't hear from anybody from the Prosecutor's Office. For the next I don't know how many weeks or so I kept asking him: What is going on with the Prosecutor's Office? Nobody has contacted me. He'd tell me: I'll talk to Tobin. I come back the following day. Mr. Tobin really doesn't know what's going on, he says, but sit tight, keep the money, and the Prosecutor's Office is going to be in touch with us.

Q. And when did the Prosecutor's Office finally reach out to interview you?

A. December 23rd.

Q. And you made arrangements to go in and see them and turn in the money the day after Christmas. Is that correct?

A. Yes, sir.

Q. Now, when you initially were attempting to tell Haggerty what had happened, were you trying to see if he would take a bribe?

A. No, sir.

Q. Were you attempting to test the waters to see if he would be receptive to taking a bribe?

A. No way.

Q. When you say that, Judge Breslin, explain to the panel why you knew that Haggerty would not take a bribe, and that you would never attempt to offer him money to get someone a job on the police department.

A. There's no way under the sun he would have taken the money. He was that type of person. He can't be bought.

Q. And you knew this?

A. Of course.

Q. Looking back on this incident, Judge Breslin, what, if anything, would you have done differently?

A. Probably would have bypassed Mr. Haggerty and went directly to the local person that was in charge of the police department and told him right off the bat,

without going through Mr. Haggerty. But that's what I did because I thought I should do that first.

Q. Why did you think that was the appropriate way to handle the matter?

A. At that point in time, as people have testified, you couldn't trust anybody in the town of Lyndhurst. The dealings, my dealings with the police department changed completely when this whole mess went on. I had police officers trying to get things over on me just because they knew I was on Haggerty's side. I had nothing to do with the whole situation. I didn't know who I could trust down there or who I could talk to.

Q. Trust in what respect?

A. To make sure that when I went down there I wasn't going to get—everything was going to get turned around on me and all of a sudden I'm the bad guy here, which happened anyway, but.

Q. You're saying that there were members of the police department that you thought would try to set up Haggerty because they were unhappy with the way he was doing his job?

A. No question in my mind.

Q. That's why you had some concern about, you know, who in the police department could or could not be trusted to do the right thing?

A. That's right.

\* \* \* \* \* \* \* \*

Q. The weekend when you found out about the bribe, the Monday before you spoke to Mr. Haggerty, you didn't try to reach Chief Tobin, did you?

A. No, I didn't.

Q. In fact, after Mr. Haggerty said: I don't want to know nothing from nothing, you still didn't try to reach Chief Tobin, did you?

A. No, I decided to go back to Mr. Haggerty, tell him I was going to Chief Tobin.

Q. And it's your testimony that you made that

decision, that you're the one that affirmatively sought out Mr. Haggerty the second time. That's what you're telling this panel?

A. The second time we talked?

Q. Yes.

A. I'm not sure who—that was what was in my mind. I'm not sure who initiated the contact.

Q. Now, Judge, just so I'm clear, and so that the panel is clear, did you know who was in charge of the Lyndhurst Police Department at the time of this bribe attempt?

A. I know Mr. Tobin was the acting chief. He was on loan. For how long, I didn't know.

\* \* \* \* \* \* \* \*

Q. The person that you attempt to report it to is Mr. Haggerty. Correct?

A. Correct.

Q. And you do that in the form of a hypothetical question. Correct?

A. Correct.

Q. And after he says: I don't want to hear anything about this, you stop, you don't ask him who you should report it to, do you?

A. Not that day, no.

Q. You don't say: Paul, my friend, I got to tell you this. This is important. Someone is trying to bribe us, or bribe you, do you?

A. I didn't want to talk in front of other people.

Q. You didn't even want to report a crime in front of somebody else. Correct?

A. I just said I didn't feel it was the other person's business.

Q. So you didn't say: Paul, let's go into a booth, let's go next door, let's go to your house. Let's go to your car. I've got something important to talk to you about. You didn't do that, did you?

A. No, I didn't.

Q. Judge, did you think this was an important issue?

A. Yes, sir.

Q. But you didn't do any of the things that we just talked about.

A. Again, for the way the town was at that particular time, one faction against the other, and everybody out to set everybody else up—

Q. Are you finished?

A. Yes, sir.

    *        *        *        *        *        *        *        *

Q. Now, Judge Breslin, your testimony today, as well as your testimony before the A.C.J.C., was that your conversation with Mr. Ciardella when he came to your office on that Thursday was, I believe your testimony today was 30 seconds, a minute, a minute and a half at most. Correct?

A. Correct.

Q. Are you aware of the fact that Mr. Ciardella, in both the tape recording of his conversation with Mr. Haggerty and his sworn statement that he gave to the Prosecutor's Office, says that it was a much longer conversation?

A. I saw that in his statement to the prosecutor.

Q. And are you aware of the fact that he says that he and you had a conversation in which you opened up the envelope and asked, in effect, what's this?

A. I'm aware of what he said, yes.

Q. But you don't believe that that's the way it happened.

A. I know it didn't happen that way.

Q. So again, your testimony and Mr. Ciardella's testimony are not in agreement. Correct?

A. Correct.

MR. FLOOD: Objection to the use of the word testimony.

MR. MILLER: I'm sorry, statements. Statements.

    \*      \*      \*      \*      \*      \*      \*      \*

Q. And just so the record is clear, let me show you Exhibit C–6, which is Mr. Ciardella's sworn statement to the Prosecutor's Office, given on January 29th, 1997, and I will turn your attention to page five, and the second line of that statement. You see it begins with the question:

"QUESTION: Subsequently, did you go to Mr. Breslin's office in November of 1996?"

"ANSWER: I think it was like October, November of '96, yes. I went there on a Thursday, if I recall, between eleven and twelve, that range."

"QUESTION: You went to his office?"

"ANSWER: Yes."

"QUESTION: Was there anyone else in the office at that time?"

"ANSWER: Just his secretary, nobody was with me."

"QUESTION: Does Mr. Breslin have a closed door office?"

"ANSWER: No. There's those that pulls, but I don't think so, there's those that you pull."

"QUESTION: Did you have a conversation with Mr. Breslin in his office?"

"ANSWER: Yes."

"QUESTION: What was the content of that conversation?"

"ANSWER: I says to him: I understand that you know Mr. Haggerty. Is there any possible way you can help me get Joey a job? I don't want to insult you. Here's an envelope with his resume in it and his application and two envelopes. He looked at it and said, what's that? I said, come on, Jim, I'm a street person. I don't want to insult you. If you can help Mr. Haggerty with the campaign, I don't know if he's going to run anymore, I don't know if he's tired of the stuff that's going on, if he wants to run or have a campaign. We'll take people to San Carlo, I'll go to Shop Rite, pass out flyers, I'll do anything to get Joey a job." And then it continues on page six, at the bottom.

"QUESTION: When you gave the envelope—excuse me, the envelopes to Mr. Breslin, did he look inside the big envelope?"

"ANSWER: He took the application out which had a big paper clip on it and he looked through it and he said, big boy, college, two years college. And he looked in the envelope and he looked surprised. And he said, what's that? And I says, come on, you know what that is. That's what we discussed. Maybe you can use it for a campaign and go on from there. And I says to him at the time, if I'm insulting you, turning you off, or I'm going to get you in trouble, stop now. I don't want to do anything wrong relatively."

"QUESTION: And what did he say?"

"ANSWER: Just looked surprised at me."

"QUESTION: Did he say anything about the envelopes or the resume?"

"ANSWER: No. He just put them on the side of his desk, or in the in front of his desk."

"And again, your testimony, Judge Breslin, is that none of that conversation took place when you met Mr. Ciardella. Correct?"

A. That's correct.

(It should be noted that the hearing panel, in its decision, stated:

We elect not to rely substantively on the statements of Ciardella regarding his conversations with respondent that are contained in either the electronically recorded January 5, 1997 conversation between Ciardella and Haggerty (Exhibits C–3b and c) or in the statements Ciardella gave to the police (Exhibit C–6). We make this election for three reasons:

1. Ciardella's apparent inability to testify before the panel due to a mental impairment caused by recent stroke; 2. the consequent inability of respondent to cross-examine Ciardella; and 3. a consequent lack of opportunity to assess Ciardella's credibility.)

### B. Testimony of Paul Haggerty

1. Exhibit C–2 is the statement of Paul Haggerty on January 2, 1997, taken in response to questioning by Sgt. Randazzise, Special Investigations Squad, Bergen County Prosecutor's Office.

Q. Do you know a James Breslin?

A. Yes.

Q. How do you know James Breslin?

A. I've known James Breslin for goodly number of years as a close personal friend, sports enthusiast. We have gone to many, many basketball games, football games.

Q. Does Mr. Breslin hold any position in the Municipal Government of Lyndhurst?

A. Yes.

Q. What is that?

A. Its Town Magistrate, has been for a goodly number of years.

Q. His professional occupation?

A. He is an attorney.

Q. Does he also practice law in the Town of Lyndhurst?

A. Yes, he does.

Q. Do you have a close, personal relationship with Mr. Breslin?

A. Yes, I do.

Q. Do you socialize with Mr. Breslin?

A. Yes.

Q. Is that family or within the political scene?

A. More as family rather than the political scene. Certainly not the political scene.

Q. Did there come a time in late October of 1996 when Mr. Breslin had a conversation with you about a resume?

A. Yes.

Q. Would you please tell me what that conversation entailed?

A. He mentioned to me that a client had been to visit his office that afternoon with a resume of his son which he is interested in a position with the Lyndhurst Police Department.

Q. Has Mr. Breslin ever come to you before with a resume in his hand?

A. Not to my recollection.

Q. Where did this conversation take place?

A. In La Cibeles Restaurant in Lyndhurst.

Q. What was the outcome of that conversation?

A. The outcome of the conversation was quite brief and as Mr. Breslin had mentioned that when his client had left he had realized there was also an envelope containing what he thought would be money to hand to me and upon hearing that, I said words to the effect that is the end of that conversation. I do not want to hear anything further along those lines.

Q. Did you ask who his client had been?

A. I did not.

Q. Did you leave the restaurant at that time?

A. Probably not.

Q. Did Mr. Breslin remain in your company?

A. Probably so.

Q. There was no conversation about the resume?

A. That is correct.

Q. What did you do after you had this conversation with Mr. Breslin?

A. What I normally do every night, I'm home at 6:30 in my own home.

Q. Did you tell anyone at that time?

A. I told my wife and my younger son Brian.

Q. What did you tell them?

A. I told them—I repeated what James Breslin had told to me and that I felt that there was money involved, in that envelope. I didn't want to hear further about it. I went further to state upon being queried by my wife, no, I did not, honey, ask who that client was. I do not want to know who the client was or anything about that individual.

Q. When was the next time you spoke to Mr. Breslin about this incident?

A. Probably not for another two or three weeks.

Q. Did you mention this to anybody besides your wife and son?

A. Only to our Acting Chief Jim Tobin.

Q. Was that before or after you spoke with Mr. Breslin about the name?

A. That was before I spoke to Mr. Breslin about the name of the client. I believe it was. I believe it was.

Q. Why did you ask Mr. Breslin the name of the client?

A. I asked Mr. Breslin the name of the client because I had heard conversations from my wife, a retired school teacher, about a particular name and certain things that were taking place with the Board of Education insurance, however that did not bring me to speak to Mr. Breslin at that time, but my curiosity had me thinking that both Mr. Breslin as well as I, were probably trying to be set up, to bring us both down. When I heard that name I did ask Mr. Breslin the name and he mentioned this particular name which ties in with the same name I had heard being mentioned about the Lyndhurst Board of Education insurance monies or funds, I went to Jim Tobin and mentioned it to him.

Q. What was the name that was mentioned by the Board of Education?

A. I only know the last name as Ciardella.

Q. Mr. Breslin told you?

A. Ciardella.

Q. As a result of the conversation with Acting Chief Tobin, did you memorialize that incident on paper?

A. Yes, I did.

Q. Did you have any conversation with Mr. Breslin about being contacted?

A. Yes, I did.

Q. What was the result of that?

A. Well, I had mentioned to Mr. Breslin that I had brought this to the attention of Mr. Tobin—Chief Tobin and Chief Tobin asked me to put this in writing and I gave Jim Breslin a copy of the very same note which I gave to Chief Tobin and which you folks have in your hand.

Q. Did Mr. Breslin ever tell you how much money was in the envelope?

A. He did not.

SR. INV. GENTLE: Did you ever ask him?

A. No, I did not.

SR. INV. GENTLE: Mr. Haggerty, you mentioned that when you had your meeting at La Cibeles Restaurant and you spoke to Mr. Breslin about this he mentioned it to you in fact?

A. Pardon me, may I just interrupt here. I don't like the term meeting, Jim Breslin and I and several other business people and professional people gather there perhaps for a drink or two in the evening.

SR. INV. GENTLE: Did anyone else hear the conversation?

A. Meeting sounds clandestine to me.

SR. INV. GENTLE: Did anyone hear you discuss this matter?

A. I don't know, probably not.

SR. INV. GENTLE: Did you recommend to Mr. Breslin for him to do anything at that point regarding this issue?

A. No.

SR. INV. GENTLE: Did it ever come up during the first discussion that you and Mr. Breslin discussed this matter at La Cibeles; is that correct?

A. Yes.

SR. INV. GENTLE: He mentioned to you about this resume and envelope and briefly indicated he believed that there was some type of problem?

A. Yes.

SR. INV. GENTLE: Is that fair to say?

A. That is correct.

SR. INV. GENTLE: You suspected some type of cash maybe in that envelope; is that also fair to say?

A. Correct.

SR. INV. GENTLE: Did you instruct or recommend to Mr. Breslin for him to do anything with this?

A. Well, now I'm going to put it in vernaculars. I said to Jim Breslin at that time, I said if there's any cash in there take it and tell your client to shove it up his ass, pardon my French.

SR. INV. GENTLE: Did he say anything to you?

A. I guess he laughed, I don't know.

SR. INV. GENTLE: Did Mr. Breslin know that you were going to speak with Chief Tobin?

A. Yes.

SR. INV. GENTLE: You mentioned that prior?

A. I don't recall if it was prior or afterwards.

SR. INV. GENTLE: You don't recall?

A. I probably mentioned to him that I was going to speak to Chief Tobin.

SR. INV. GENTLE: How long after that La Cibeles gathering?

A. I can't recall. This whole thing transpired between the time of our initial conversation and the time that my brain started to click in and say I don't like what's going on around here, could have been two or three, three and a half weeks. I don't recall.

SR. INV. GENTLE: Do you know what attorney is representing the Board of Education in Lyndhurst?

A. Richard Delassio.

SR. INV. GENTLE: Do you know if Mr. Delassio is also representing the Board of Education in the insurance matter?

A. I can't say one way or the other on that.

SR. INV. GENTLE: Do you know if Mr. Breslin is?

A. I don't know if he is. I doubt if he is.

SR. INV.—GENTLE: But you don't specifically recall speaking to Mr. Breslin prior to your letter that you were going to bring to Chief Tobin's attention?

A. Honestly I don't recall, honestly.

SR. INV. GENTLE: Prior to you providing Mr. Breslin a letter on November 27th 1996, is this the copy of the letter I'm showing you here?

A. That's it, yes.

SR. INV. GENTLE: During that period of time from when you spoke with him at La Cibeles until November 27, 1996, did you have any conversation at all with Mr. Breslin during that time period regarding this matter?

A. I'm trying to think if that's—I probably did and that's when the prodding of my wife and son as to who it was, let's find out who this slime bag is, I probably did get the name and when he mentioned the name Ciardella to me, it was probably at that point that I had ducktailed a couple of things together, this particular name relative to the Board of Education and this particular situation and I said now I'm going to go there.

SR. INV. GENTLE: I don't have any further questions, thank you.

Q. Have you told anyone outside of Mr. Breslin and your immediate family about this incident?

A. Absolutely not. Absolutely and unequivocally no.

Q. Has Mr. Breslin ever brought you resumes before?

A. I don't believe so, not to my recollection, no.

Q. As the police commissioner, have you ever been approached by anyone whether in the department or outside of the department about hiring individuals?

A. Constantly.

Q. Have you hired any of those individuals?

A. Probably.

2. Paul Haggerty also testified before the three-judge panel on September 30, 1999. His direct examination was conducted by Mark Fleming, Assistant Attorney General.

Q. How do you know Judge Breslin?

A. I've known him as a friend for, I dare say, some 25 years, if not longer. As a matter of fact, his dad and my father-in-law were very, very dear friends, and both served as prosecutors a long time ago.

Q. Is it fair to say you're very close friends with Judge Breslin?

A. Yes, it is.

Q. Do you have a business relationship with the Judge?

A. No, he's in the legal profession, and I'm in the investment business.

Q. Are you his stockbroker?

A. I am, sir.

Q. Do you socialize with him frequently?

A. Occasionally.

Q. About how often do you see him socially?

A. Well, we might see one another two or three times a week.

Q. Do you presently hold any public positions?

A. No, sir.

Q. Did you hold public office in or about October '96?

A. Yes, I did.

Q. And what office did you hold at that time?

A. I was the Commissioner of Public Safety, which included police, fire, first aid, the court system, et cetera.

Q. In that capacity as commissioner, did you have the power to hire police officers?

A. Yes, sir.

Q. And in fact, you hired Judge Breslin's son as a police officer. Is that correct?

A. That is correct, sir.

Q. Okay. Going back to 1996, did there come a time when you and Judge Breslin had a conversation about a resume for the police department?

A. Yes, sir.

Q. And what did that conversation entail?

A. To the best of my recollection, he mentioned that there was a client into his office a few days prior, because this was on a Monday or a Tuesday, a weekend had transpired, with an application for the police department. And he went further to tell me that when he—he was curious as to take a look at the application, opened it up, and he saw two additional envelopes in there.

Q. Did you ask him what was in those envelopes?

A. He assumed there was money in it.

Q. And what was your reaction to that conversation?

A. My reaction was my normal reaction.

Q. Which is?

A. Which was upsetment.

Q. And did you say something to the judge at that time?

A. Apparently, I said words to the extent that, you can tell him what to do with that application and whatever else accompanies it.

Q. Did you ask the Judge what the name of his client was?

A. No, it was a couple or three days later.

Q. What did you do after that first conversation? Did you go home?

A. Surely. I'm home by 6:30 every evening.

Q. And did you tell anyone about the nature of that conversation you had with Judge Breslin?

A. I certainly did.

Q. And who did you discuss that with?

A. My wife and my sons.

Q. And what was their reaction?

A. What would anybody's reaction be? I guess they were stunned. Because anybody who knows me knows you don't pull that stuff off with me.

Q. Did they give you any advice as to what your next step should be?

A. I guess they had to calm me down first, settle me down, because I was just like very upset. Like I couldn't think straight.

Q. When was the next time—Did you subsequently discuss this issue with Judge Breslin a second time?

A. Yeah, when I asked him who it was, the name of the individual.

Q. And do you recall when that second conversation took place?

A. Oh, it was probably about three or four days after the first one, the next time I saw him.

Q. Do you remember giving a sworn statement to the Prosecutor's office about this matter?

A. According—yes, I do.

Q. I'm going to ask you to take a look at what's been marked C–2 in evidence. I ask you to look it over.

A. January 2nd, okay.

Q. And do you remember, or could you identify that document?

A. I had never seen the document before. I remember making a sworn statement.

Q. So you were under oath at the time you gave the statement?

A. Absolutely.

Q. And does C–2 appear to be a transcript of that sworn statement that you gave?

A. Well, I was up at the Prosecutor's office on two occasions prior to giving a sworn statement. So I, you know, I just don't know. I haven't read this thing. If I said it.

Q. Take a minute and look it over, please.

A. All right.

Q. Mr. Haggerty, to save the Court's time, I would direct you to the first page of the statement. Is that captioned: Statement of Paul Haggerty?

A. Yes.

Q. And at the bottom of page one it indicates witness sworn, and you taking the oath. Is that correct?

A. Yes.

Q. Okay. I would direct you to page six of C 2.

A. Um-hmm.

Q. Actually, if you could turn to page five first. There's a, several questions and answers about Mr. Breslin coming to you with the resume—I'm sorry,

describing the conversation about the resume at the top of page five. Do you see that question and answer?

A. Right.

Q. Do you remember being asked these questions by the Prosecutor's office?

A. I guess so.

JUDGE MUIR: Do you remember them, Mr. Haggerty?

THE WITNESS: I don't remember the exact, each question, your Honor, but of course I remember it, yes. This was all part of my testimony, I'm sure. Sure.

Q. Okay. Then turning to page six, the second question from the bottom, I would ask that you read that question and answer into the record, please.

A. When was the next time you spoke to Mr. Breslin about this incident?

Q. And the answer?

A. Probably not for another two or three weeks.

"QUESTION: Did you mention this to anybody besides your wife and sons?"
"ANSWER: Only to our acting chief, Jim Tobin."

Q. So in your sworn statement, C-2, you indicate that the second conversation took place approximately two or three weeks after the first. Is that correct?

A. I don't recall. Maybe that's what I say here, but I don't think it was. Two or three weeks? It couldn't have been that long since I had seen him.

Q. I would also direct you to page 13 of C-2. And I would ask that you read into the record the first and second question and answer at the top of that page, 13.

A. "So it took you two or three weeks to get up the nerve to ask Mr. Breslin? It wasn't nerve. I didn't want to know anything. I'm a crazy sort of guy." "Why did you want to know in two or three weeks?"

"ANSWER: Because I felt there was something going on to set up certain people, number one included."

Q. Thank you. So your sworn statement in July—or I'm sorry, January '97 indicates in several places, does it not, that you raised the matter with Judge Breslin a second time in two or three weeks?

A. That's what it says.

Q. And you were under oath at the time you gave that testimony, were you not?

A. Yes.

Q. So is it fair to say that that testimony was true to the best of your belief at that time?

A. I would imagine, yes.

Q. When this second conversation took place, was it you who initiated that second conversation with Judge Breslin?

A. I don't remember.

Q. Were you interested in learning the name of Judge Breslin's client that had made this offer to you?

A. Yes.

Q. And did Judge Breslin tell you the name of that client?

A.  Yes.

Q.  And what was your reaction when you heard that client's name?

A.  My reaction was that this all tied in to a particular conspiracy that was in place to, to hurt my reputation.

Q.  And did you tell the Judge what you were going to do about this?

A.  I believe I did the next day.

Q.  And what did you tell him?

A.  Well, there again, you're looking for words. I mean I can tell you the essence of it. I said, we're going to the Prosecutor's office with this, I'm telling Tobin.

Q.  So it was you who went to Mr. Tobin after the second conversation?

A.  I don't recall exactly when, but it was very shortly after. Very early on.

Q.  Was it after the second conversation?

A.  I just don't remember.

Q.  Okay. I'm going to ask you to take a look at C–2 again, please, page 7, and ask you to read into the record the second question and answer on page 7.

A.  "That was before I spoke to Mr. Breslin—"

Q.  Sorry, the second question.

A.  Second question.

"QUESTION: Why did you ask Mr. Breslin the name of the client?"

"ANSWER: I asked Mr. Breslin the name of the client because I had heard conversations from my wife, a retired school teacher, about a particular name and certain things that were taking place with the board of education insurance. However, that did not bring me to speak to Mr. Breslin at the time, and my curiosity had me thinking both Mr. Breslin as well as I were probably being set up to bring us both down. When I heard that name, I did ask Mr. Breslin the name, and he mentioned this particular name, which ties in with the same name I had heard—"

JUDGE MUIR: You have to read it entirely.

THE WITNESS: Yes.

JUDGE MUIR: You stopped at: "When I heard."

A.  "When I heard the name, I did ask Mr. Breslin the name, and he mentioned this particular name, which ties in with the same name I had heard being mentioned about the Lyndhurst Board of Education insurance moneys or funds. I went to Jim Tobin and mentioned it to him."

Q.  Thank you. And that name that was mentioned was Ciardella; is that correct?

A.  Yes, sir.

Q.  So after you heard the name Ciardella, you then went to Jim Tobin?

A.  Yes.

Q.  In either conversation you had with Judge Breslin about this, did he indicate what he was going to do with the money in the envelopes?

A. No.

Q. So after you went to Acting Chief Tobin, do you recall how soon after that second conversation you went to speak to Mr. Tobin?

A. Would you phrase that again.

Q. I'm sorry. How long after the second conversation did you go report this to Mr. Tobin?

A. I would say the next day.

Q. And did Mr. Tobin ask that you put your report in writing?

A. No, sir.

Q. I'm going to ask you to look at C–9 which has been marked into evidence?

A. Yeah, this is as of the 27th of November, though.

Q. Do you recognize this statement?

A. Yeah, but that's as of November 27th.

Q. I haven't asked the question. Do you recognize the statement?

A. Oh, yeah, sure.

Q. And could you describe this statement?

A. Yes. A lengthy period of time, what seemed to me to be two or three weeks after initially mentioning the situation to Acting Chief Tobin, and I believe the first day, my first conversation with him—

Q. This is a statement, I'm sorry, this is a statement that you gave to Mr. Tobin at his request?

A. Yes.

Q. And it's dated November 27th, 1996. Is that correct?

A. Right.

Q. And the first line of that statement, could you read that into the record, please.

A. "Approximately three or four weeks ago a dear friend, an attorney, James A. Breslin, Junior, also a magistrate court judge, told me that a client of his came to his office on a particular matter."

Q. Thank you. So that indicates, does it not, that three or four weeks prior to November 27th, Mr. Breslin mentioned this to you for the first time. Is that correct?

A. That's correct.

Q. Okay. And then your sworn statement to the Prosecutor's Office indicates that two or three weeks after the first conversation you had a second conversation. Is that correct?

A. That's what the statement says, yes, sir.

Q. And that statement was given under oath. Is that correct?

A. Correct.

Q. From the time Mr. Tobin asked you to put your report in writing to the time you submitted this report, how long did it take you to write up this report, do you recall?

A. Well, he asked me to put it in writing, I did it that very next morning in my office.

Q. And—

A. But he had been aware—

Q. You've answered my question. Thank you.

A. All right.

Q. So you wrote the statement the following morning. And when did you hand that statement to Mr. Tobin, same day it was done?

A. The same day.

Q. Now, returning to C–2 for a minute, prior to giving that sworn statement did you have a pre-interview as Prosecutor's office?

A. At least one or two. I'd like to look. The date of this is January 2nd. Yes, I had been there at least twice prior to that.

Q. Did you spend some time with the Prosecutor's representatives on January 2nd before you gave this sworn statement?

A. Did I spend some time with them prior? Would you be a little more specific as to what you mean there.

Q. Did you, did you walk in the door that day, take the oath, and immediately give the sworn statement?

A. I don't remember.

Q. Did you hear the sergeant's testimony this morning? Were you in the courtroom for that?

A. Yes.

Q. Did you hear the testimony about her, about her recollection of your comments regarding your purpose in bringing this matter to the Prosecutor's attention?

A. It was, to be honest with you, sir, it was difficult to hear her. I was in the second or third row back there and I couldn't hear too well.

Q. I'm going to show you what's been marked C 15 for identification and ask you to examine that document. Specifically, I would direct you to the second to the last paragraph on page two. Do you see that paragraph, sir?

A. Um-hmm.

Q. That paragraph quotes comments that you made in this interview report. Is that correct?

A. Apparently so.

Q. Did you make those comments, sir?

A. I'm sorry?

Q. Did you make those comments?

A. I don't remember. But they're here, so I guess I did.

Q. I'm sorry, just one or two final questions.

Again, referring back to C–2, the sworn statement, I'd ask that you take a look at the last page of the sworn statement, which again refers to your conversation

with Judge Breslin. Could you read the top question and the following answer into the record, please.

A. "Did he tell you what he was going to do with the envelope?"

"ANSWER: He said, I'm waiting to hear back from the individual. I hadn't heard back from this guy down in Toms River or wherever."

MR. MILLER: Thank you. No further questions.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

CROSS–EXAMINATION BY MR. FLOOD:

Q. Mr. Haggerty, how long have you known James Breslin?

A. I've, just to venture a guess, I'd say a quarter century.

Q. Are you familiar with his reputation in the Lyndhurst community for honesty and integrity?

A. Yes, sir.

Q. Please tell the judges on this panel what that reputation is.

A. The name Breslin in our town, your Honors, is synonymous with the finest names in Bergen County. Never has there been anything but wonderful things said about the Breslins.

Q. Let's focus on Jim Breslin. I want you to focus on what you know about Jim Breslin's reputation.

A. Jim Breslin. As a judge and magistrate, he has been known as fair and honorable and yet stern as anyone ever. He's probably been the longest serving judge in the 40 plus years that I've lived in Lyndhurst, longest serving by far. The policemen with whom he has to work ever so closely, when called out on arraignments at all times of the day and night, hold Mr. Breslin in the utmost respect. Everybody in town just reveres him for being fair, quiet, a very quiet individual, keeps to himself, loves his sports, loves his golf, talk to you about sports until the crows––

Q. Mr. Haggerty, have you ever known James Breslin to be untruthful to you?

A. Absolutely never.

Q. Have you ever known James Breslin to do anything dishonest with respect to any of your dealings with him?

A. Never.

Q. Have you ever known of Judge Breslin to do anything dishonest as far as any other members of the community are concerned?

A. Absolutely not.

Q. Now, you stated when you were testifying on direct something to the effect that, anyone who knows me knows that you are extremely honest and would not do anything improper as the police commissioner or a borough official.

A. Yes, sir.

Q. Just what were you trying to say to the members of this panel about what your reputation was for honesty and integrity in Lyndhurst?

A.   Now you're asking me to talk about myself.   But I want everybody, your Honors to know that reputation means more to me than anything else in this world. You ask me something, you're going to get an honest answer.   You're never going to get a dishonest answer.   You try to bribe me and you're not going to get anyplace.   It happened back in 1965, when I happened to be the president of the board of education and was in a position to have a new school built or something or other built.   And someone came up to me as I was exiting a funeral parlor with an envelope and says: Here's $5,000.00, now just do what you got to do.   And I let that be known at that time.   You just don't do this.   I mean I spent 11 years in the Marine Corps.   And I consider myself a good church goer, a good family man, and you can say anything, but you're not going to get me on my reputation.

Q.   Would it be fair to say that it was common knowledge in Lyndhurst that Paul Haggerty was not for sale?

A.   Everybody knows it.

Q.   Would it be fair to say that at no time did you ever assist anyone to get a job on the police department because anyone had offered you anything improper by way of money or any other consideration?

A.   That's correct.

Q.   Would it be fair to say that everyone that had been hired as a police officer in Lyndhurst under your watch got the job because they were qualified and applied in the normal course of events?

A.   Yes, sir.

Q.   Would it be fair to say that Judge Breslin was aware of your reputation and the way you conducted yourself as a councilman and as a police commissioner in Lyndhurst?

A.   Absolutely.

Q.   And would it be fair to say that Judge Breslin knew that under no circumstances would Paul Haggerty take any money or do anything improper to get someone a job on the Lyndhurst Police Department?

A.   Absolutely.

Q.   And you saw Judge Breslin on two or three occasions a week.   Is that correct?

A.   Yes, sir.

Q.   And would it be fair to say that he knew you as well as anyone else did in Lyndhurst, that was not a family member, of course?

A.   Certainly did.

\*          \*          \*          \*          \*          \*          \*          \*

Q.   Now, as I understand your testimony, you and Judge Breslin would meet on two or three times a week to socialize and perhaps have a drink before going home in the evening?

A.   Correct.

Q.   And would it be fair to say that Judge Breslin knew that if he wanted to tell you something that he could find you at a particular location in Lyndhurst?

A. Sure.

Q. And what's that location again, please?

A. LaSobella's Restaurant on Ridge Road in Lyndhurst.

Q. Now, I would like you to describe for the panel what the situation was with respect to the chief of police position in Lyndhurst at the time of this incident.

A. Okay. The situation that existed in Lyndhurst during my four year term of office as public safety director was, was a horror story. I took that particular office in May, mid May of 1993, a four year term of office.

JUDGE MUIR: Mr. Haggerty, I think he's talking just specifically at the time this arose. So—

MR. FLOOD: Let me rephrase the question.

Q. Was there some controversy as to who the chief of police was, and was there some confusion with respect to—

A. Yes, there was.

Q. —that particular position?

A. Yes.

Q. Please try to describe that situation to the members of the panel.

A. There was a tremendous amount of controversy and a tremendous amount of people trying to wheel and deal and, how do you describe it? I read books on it.

Q. Well, let me ask you this. Was there, had there, had one of the chiefs resigned? Who was that?

A. All right. I guess the best way to describe this situation is that in, what prompted me to call the Attorney General in which subsequently brought the Prosecutor in—let me just. In July of 1996 our chief at that time, John Scalese, was taking his terminal leave to lead up to retirement. And the day before he was leaving, I appointed someone to act in his stead as acting chief during his absence. That was done perhaps at four o'clock or so on a Thursday afternoon. And on the Friday morning which was to be his last day, he was only coming in to clean out his desk, he had countermanded my order and named his own successor to himself, who happened to be our Deputy Chief at the time.

The situation was most upsetting and that Friday afternoon, the day of the occurrence, I contacted the Attorney General's office to get a ruling, and because it was a Friday afternoon in the summertime, and you couldn't get any kind of a ruling then. So Monday morning, actually I guess it was Monday morning, then, the Attorney General's office sent a letter to Acting Prosecutor Charles Buckley in Lyndhurst, copies of which I have, I think it's very pertinent, if I may.

Q. Just, the point I'm trying to make is that there was controversy in terms of who would be the chief of police. Correct?

A. Very, very major controversy.

Q. And there was, before Tobin was placed there as the acting chief, there was disagreement as to who should be the chief. Correct?

A. Yes.

Q. And it was not clear how long Captain Tobin from the Prosecutor's Office would be the chief of police. Correct?

A. It wasn't clear.

Q. Now, you also alluded I think when you were testifying on direct to the situation that existed in Lyndhurst that I believe you felt someone was out to get you. Is that correct?

A. Yes, sir.

Q. And can you just briefly describe what caused you to have those feelings, and what the situation was politically speaking at the time in Lyndhurst?

A. I can cite several examples. Leading up to the retirement of Chief Scalese, there were three leading candidates. There was Deputy Chief and two captains, any of whom could have been appointed chief. And everybody had his own favorite, so to speak, in various clicks here and clicks there, and everybody was trying to figure out whom I was going to name as Chief Scalese's successor.

There was a time where Deputy Chief Bob Giangeruso came into my office and told me that I had to make him chief. I had to make him chief. And that if I didn't, I'd be hearing from his friend and attorney, Bobby Galantucci. I was always hearing that name thrown in my face from Bobby Giangeruso.

There would be evenings when, or there would be days or occasions where I would hear from people we know, the police department, you better watch out, they're looking to get you on some trumped up charge of DWI as you come out of a restaurant. Even had me paranoid up in Paramus where my business office was at the time.

I know I went to a social club in town on a particular Friday evening and I was told, be careful when you go out, there's a police officer parked across the street looking to nail you. So needless to say, I simply called my son and said, come on down and pick me up.

Although I was fine. But there were numerous, numerous situations where things of this sort were taking place.

Q. Would it be fair to say, then, Mr. Haggerty, that there were many people that lived in town that were not happy with some of the decisions that you had made as police commissioner and as councilman?

A. That is correct.

Q. Would it be fair to say that you were concerned that someone would try to set you up in some way because of their dislike for you and some of the things you had done?

A. I was very concerned, and so was my family.

Q. And would it be fair to say that in the two or three times a week when you would get together with your friend, Jimmy Breslin, that the concerns that you had were made known to him?

A. Very definitely.

Q. So he was aware of your concern that someone would be trying to set you up. Correct?

A. Yes, sir.

Q.  Now, when Judge Breslin came to the restaurant and told you about the application he had received from a client, did you think he was trying to bribe you or see if you were willing to accept any money to give some guy's son a job on the Lyndhurst Police Department?

A.  Absolutely not, because he knows me and has known me for a quarter of a century or more, he knows me better.  No, absolutely not.  He was looking for: What are we going to do about this?

Q.  Just so there's no misunderstanding with this panel, do you think there was any chance at all that Breslin was trying to see if you would take the money?

A.  Absolutely not.

Q.  Now, what do you think Breslin was attempting to do the first time he spoke to you at that restaurant?

A.  Looking for help, or maybe—I don't know.  Looking for help, tip me off, what are we going to do about this crazy situation?

Q.  Now, you cut him off before he gave any more details.  Correct?

A.  Yes, I did.

Q.  You went home that night and you were upset and you spoke to members of your family.  Correct?

A.  Yes.

Q.  Would it be fair to say that it was the next time that you saw Jimmy Breslin that the two of you discussed this matter again?

A.  Well, you see, sometimes—

Q.  If you remember?

A.  I just don't remember.  I mean sometimes, you know, he's got a court case here, a court case there or wherever, or I'm tied up on business.  I couldn't tell you what time it was, but it was, I'm saying, I don't remember.

Q.  Well, was it shortly thereafter that he spoke to you and you spoke to him about this matter again?

A.  I'd say probably within a week.

JUDGE MUIR:  Mr. Haggerty, you're telling us you have no fresh recollection?

THE WITNESS:  Honestly, your Honor, no, I can't recall that.

JUDGE MUIR:  All right.

THE WITNESS:  If I may—no, I guess I can't talk.

JUDGE MUIR:  That's all right.

Q.  Well, do you recall, though, given the normal pattern that you had of socializing with Judge Breslin that you saw him two or three times a week?

A.  Yeah, we would normally see two, three times a week.

Q.  Would it be fair to say if the first time you and he discussed this matter was early in the week, on a Monday, that there's a high degree of probability that you saw him at least one other time—

MR. FLEMING:  Objection, your Honor.  He's testified he has no recollection.

JUDGE MUIR:  Sustained.

Q. Do you have any recollection when it was the next time you saw James Breslin that week?

A. No. I don't remember talking a long time ago.

Q. Now, when do you recall—now, at the second meeting you and Judge Breslin agreed that this had to be reported to someone in the Prosecutor's office. Correct?

A. Right.

Q. And at the time that Judge Breslin attempted to discuss this with you the first time, you were the police commissioner?

A. Correct.

Q. And the police commissioner oversaw the police department. Correct?

A. Correct.

Q. And the police commissioner also had supervisory authority over the Municipal Court personnel in Lyndhurst. Correct?

A. Correct.

Q. Now, would it be fair to say that you and Judge Breslin decided that you had a responsibility to report this to the Prosecutor's office?

A. Yeah. Yes.

Q. And you told him that you would in fact report this to the Prosecutor's office. Correct?

A. Yes.

Q. And he was in complete agreement that this should be done. Correct?

A. Yes.

Q. Now, who did you report this to?

A. Jim Tobin.

Q. And you knew that he was a member of the Bergen County Prosecutor's Office at the time. Correct?

A. I believe he was the second highest ranking member of the Bergen County Prosecutor's Office.

Q. To the best of your recollection, when in November of 1996 did you tell Captain Tobin of the Bergen County Prosecutor's office what had been reported to you by Jim Breslin?

A. To the best of my recollection, it's early November.

JUDGE MUIR: Early November?

THE WITNESS: Yes, your Honor.

Q. And when we refer to early November, would it be fair to say, and we're talking about the first week in November?

A. No, I'd say no later than the second week in November.

Q. And do you recall having any conversations where Judge Breslin would ask you: Have you reported this to the Prosecutor's office?

A. We would ask one another on a daily basis, what have you heard, what have you heard from the Prosecutor's office? I would ask him, Captain Tobin, on a daily

basis, what have you heard, what have you heard? I haven't heard back from him yet, I haven't heard back from him yet.

I would ask every day of Jim Breslin, what have you heard, assuming that he was contacted by someone in the Prosecutor's office. This went on absolutely, it's virtually every day, every day we would ask óne another, what have you heard. And I would ask Tobin every single, solitary day. And I was in that police department every day. Some of my policemen would wonder why I spent 30 and 35 hours a week there all the time. I was always there.

Q. And did Jim Breslin ask you on a very frequent basis?

A. Every time we'd see one another. What have you heard? What have you heard? Nothing, nothing. Well, what the heck are they doing? This is the gospel truth.

Q. And the note that is in evidence, and I believe that's dated November 26?

A. I got it right here, 27th.

Q. 27th. Was that note or report prepared the same day that Tobin finally asked you to reduce something to writing?

A. The day that he asked me to write it. Had it typed up at the office the next morning.

Q. Now, did you at any time think that Judge Breslin was attempting to bribe you?

A. Absolutely, unequivocally not.

Q. Did you at any time think that Judge Breslin was testing the waters to see if you would be receptive to taking money to get some guy a job?

A. No. He knew I wouldn't be receptive to anything of that sort.

MR. FLOOD: I have no further questions at this time.

## C. *Testimony of James Tobin*

3. The third critical witness before the panel was James Tobin, who had been designated as Acting Chief of the Lyndhurst Police Department from July 1996 to August 1997. In addition to his testimony before the three-judge panel, James Tobin was interviewed by John Tonelli of the ACJC on February 13, 1998. A report of that interview was admitted into evidence as Exhibit R-1.

Mr. Tonelli's report of his interview of James Tobin reads as follows:

Mr. Tobin was assigned by the Bergen County Prosecutor's Office as acting Police Chief in Lyndhurst in July 1996 in response to a conflict that occurred between the Police Commissioner, Paul Haggerty and the Chief of Police, John Scalese. Lyndhurst is governed under the Walsh Act, so Mr. Haggerty had the power to

hire, fire and promote in the police department and the municipal court. Approximately 2 days before Chief Scalese left the department on terminal leave, Mr. Haggerty promoted Captain James O'Connor as the new police chief. The last thing that Scalese did before he left was to promote Deputy Chief Robert Giangeruso as chief. Mr. Haggerty alerted the ATTORNEY GENERAL's office of the conflict, and they directed Mr. Tobin, a captain in the prosecutor's office, to serve as acting police chief on an interim basis. Chief Tobin assumed that he would only be there for a few weeks, but he remained until August 1997. Shortly thereafter, he retired from the prosecutor's office and was eventually hired as police chief in Lyndhurst on January 5, 1998. Mr. Haggerty did not seek re-election in May 1997.

When Tobin took over the police department, Haggerty visited him late in the day on a daily basis to see what was happening in the police department. In early November 1996, Haggerty told Tobin that Judge Breslin telephoned him and said that one of Breslin's clients dropped off the resume of the client's son to give to Haggerty for a police officer job. Breslin said that the envelope contained another smaller envelope. Haggerty became angry and told Breslin that he didn't want to know anything else about it. Haggerty implied that there was money in the smaller envelope, and Tobin asked him how he knew that. Haggerty said: "I just know it", but Judge Breslin did not tell him that there was money in the envelope. Tobin told Haggerty to confirm whether there was money in the envelope, and if so, whether Judge Breslin still had possession of it.

A few days later, Haggerty told Tobin that there was money in the envelope and that Breslin was ready, willing and able to turn it over to the proper authorities. Tobin informed Chief Greco of the Bergen County Prosecutor's Office of what had transpired. Tobin also requested that he not be involved in the investigation of this matter because he had his hands full with other matters. Greco told Tobin to have Haggerty prepare a report of the incident and give it to Tobin to forward. Haggerty prepared a short recitation of what occurred on November 27, 1997 and gave it to Tobin. Tobin sent it to Greco, and that ended Tobin's involvement in this matter.

Tobin assumes that Judge Breslin knew that Haggerty was reporting the matter to the prosecutor's office based on what Haggerty told him and the fact that Haggerty can't keep a secret. Tobin also believes that it is possible that Judge Breslin could have been holding onto the money until the prosecutor's office asked him to come in on December 26, 1997. Tobin recalls some delay on the part of the prosecutor's office in investigating this matter immediately. He does not know why there was a delay or who caused it.

Mr. Tobin believes that this incident was an attempted set-up by a group of people because of political reasons. Tobin pointed out a few coincidences that are difficult to explain. The group of people belong to the local Italian/American Club that is located in "The Hook" section of Lyndhurst. According to Tobin, membership in that club includes Former Police Chief Scalese, Deputy Giangeruso, Mayor Stellato and other high ranking police officers and municipal officials. As you read in the first paragraph of this report, Former Chief Scalese and Deputy Giangeruso were not Haggerty's biggest fans. After the arrest of Ciardella, Deputy Giangeruso

stormed in the detectives bureau and demanded a copy of the file in the Ciardella case. The detectives told him that they did not have a file and did not participate in the investigation of the matter. Giangeruso then stormed into Tobin's office and made the same demand. Tobin told him that the matter was handled by the prosecutor's office and that Giangeruso should go to their office and demand a copy of the file. Giangeruso quickly calmed down and kept his mouth shut. Tobin can think of no other reason why Giangeruso would be so interested in that case if he or his club were not involved.

In addition, Ciardella was represented in the criminal matter by Robert Gantalucci, Esq. who purportedly was the club attorney. Ciardella's brother was also said to be a member of the club.

James Tobin also testified before the three-judge panel on October 1, 1999. His direct examination was conducted by Assistant Attorney General, Mark Fleming.

Q. By whom are you presently employed?

A. Schwab and Company in Jersey City, New Jersey.

Q. In what capacity?

A. As an executive protection specialist.

Q. By whom were you employed in the year 1996?

A. Bergen County Prosecutor's Office.

Q. And in what capacity?

A. I was a Captain of Investigators.

Q. Did there come a time in 1996 that you received an assignment to the Lyndhurst Police Department?

A. Yes.

Q. And what was that assignment?

A. I was assigned to serve there as the acting chief of police pursuant to an order from the Attorney General's Office for the acting prosecutor, Charles Buckley, to take over that department.

Q. And who gave you that assignment?

A. Both Chief Greco and Charles Buckley gave me that assignment.

Q. And who is Chief Allen Greco?

A. He was the Chief of Investigators for the Bergen County Prosecutor's Office.

Q. Was he your immediate supervisor?

A. Yes.

Q. And for how long did you serve as acting police chief in Lyndhurst?

A. Approximately 13 months.

Q. From when to when?

A. From about July 1996 until approximately late August, early September 1997.

Q. When you were appointed acting chief was that fact publicly known to the citizens of Lyndhurst?

A. Yes.

Q. Did it receive press coverage?

A. Yes.

Q. Was it controversial?

A. I would say in town it was controversial.

Q. Did members of the Lyndhurst police force know that you were acting, appointed acting chief?

A. Yes.

Q. At that time was Judge Breslin's son a police officer in Lyndhurst?

A. Yes.

Q. When you became acting chief, where was your office located?

A. My office was located on the top floor of the municipal building, which is on the corner of Valley Brook and Delafield Avenues.

Q. And where was it located in relation to the municipal courtroom?

A. The courtroom was right across the hallway from my office.

Q. Okay. Did you have any dealings with Judge Breslin in his capacity as Municipal Court Judge?

A. I met Judge Breslin, I would say hello to him when I saw him around the courthouse, and I sat in on court few times.

Q. Do you recall if you were ever introduced to Judge Breslin as the acting police chief?

A. I was introduced to Judge Breslin to the best of my recollection by James O'Connor, who was a Captain from the Lyndhurst Police at that time. And to the best of my recollection, he said I was the acting police chief.

Q. As acting police chief did you have any dealings with Paul Haggerty?

A. Yes, frequent dealings.

Q. In what capacity?

A. Mr. Haggerty was the Police Commissioner, and I dealt with him basically on a daily basis about whatever was going on the department programs, anything we were doing. He would normally come in in the late afternoon after his job and come into my office and speak to me.

Q. Did Mr. Haggerty have an office in the building?

A. Yes.

Q. And where was that located in relation to your office?

A. Mr. Haggerty's office was two floors below me. His office was actually within the, I guess, the proper of the police department. The police desk was two floors below me, and in order to get in there you would have to go through a door and actually enter where the locker room is and the cells, and Mr. Haggerty's office was in that area.

Q. Now, in these daily meetings that you just testified to with Mr. Haggerty, did he typically come to your office?

A. Yes.

Q. Did there come a time in 1996 when Mr. Haggerty mentioned to you something about money being given to Judge Breslin that was intended for him?

A. Yes.

Q. And do you recall when that was?

A. It was approximately two days prior to November 27th, 1996.

Q. And what's the basis for that date?

A. Because that's the date that Mr. Haggerty dated his report that he was instructed to make. And I remember that when I asked him to make that report it only took a couple of days.

Q. Could you relate to the Court if you recall the substance of your conversation with Mr. Haggerty?

A. Yes. One evening Mr. Haggerty came into my office, which he did almost daily. He said he had something important to discuss. He closed the door. He went on to tell me that he had had a recent discussion with Judge Breslin from town, and that Judge Breslin had told him that he, Judge Breslin, had had some business with a client by the name of Ciardella. At the end of that business, Mr. Ciardella, according to Judge Breslin, gave the Judge an envelope containing an application for Mr. Ciardella's son to be a police officer in the Lyndhurst Police Department. Mr. Breslin told Mr. Haggerty that there were two other envelopes in with the application.

At that time Mr. Haggerty reported to me that he said: Stop, I don't want to hear any more, I don't want any part of this.

I asked him: What was in the envelopes? Mr. Haggerty told me he knew instinctively that it was a bribe and that the envelopes contained cash. And he said Judge Breslin did not know what was in the envelopes.

Q. Now, did you consider this account a serious matter?

A. Yes.

Q. And what did you do when Mr. Haggerty finished telling his story to you?

A. I reported it to Chief Greco verbally.

Q. Do you recall when you reported it to Mr., to Chief Greco?

A. Immediately.

Q. Could you describe in detail what you mean by reporting it immediately?

A. I telephoned Chief Greco at his office and relayed the information that was given to me.

Q. Do you recall if Mr. Haggerty was in the office at the time you did that?

A. I believe he was.

Q. Do you recall if you reached Chief Greco when you picked up the phone to call him?

A. Yes.

Q. That same day?

A. To the best of my recollection, yes.

Q. Do you recall what Chief Greco's response was to your phone call?

A. Yes, I do. He told me that I did not have to do a report on it, to have Mr. Haggerty do a report on it, and to get that report to him, and that he would assign the special investigation squad to follow up and investigate it.

Q. Did you relay that to Mr. Haggerty while he was still in the office that day?

A. Yes.

Q. How often did you, in your capacity as acting chief, deal or have a conversation with Chief Greco?

A. I spoke to Chief Greco every day that I was there. Maybe I missed a day here or there, but I would say every day.

Q. Was that a telephone conversation or a face to face meeting?

A. Telephone. Normally, I would get in somewhere around eight or nine or a little before eight in the morning, I would get settled in my office, plan my day. He would get, he came on duty up in Hackensack at about 9 a.m., and I would call him about 9 a.m., and tell him what was going on.

Q. Did Mr. Haggerty subsequently submit a report to you?

A. Yes, he did.

Q. I'm going to show you what's been marked C 9 in evidence. Do you recognize that document?

A. Yes, I do.

Q. And what is that document?

A. This is copy of the report that Mr. Haggerty submitted to me.

Q. And is that document dated?

A. Yes, Mr. Haggerty dated it November 27th, 1996.

Q. Do you recall if you received the document that same day?

A. That day, yes.

Q. I'm going to ask that you take a look at a calendar from November 1996. Could you tell the Court when November 27th was?

A. November 27th was the last Wednesday in November 1996.

Q. Which makes it the day before Thanksgiving. Is that correct?

A. Yes.

Q. Now, once you got this report, C-9, from Mr. Haggerty, what did you do with it?

A. I sent it to Chief Greco.

Q. Do you recall by what means?

A. I don't recall if I mailed it to him or if I faxed it to him.

Q. Do you recall when you did that? Was it the same day?

A. Yes. I would say it was the same day.

Q. Now, following receipt of the report, do you know if the Prosecutor's Office conducted an investigation into this allegation?

A. I'm aware that they conducted an investigation. However, I did not supervise or participate to a very great degree in that investigation.

Q. Did Mr. Haggerty ever inquire of you of the status of the investigation?

A. Yes, he did.

Q. Do you recall how often?

A. Maybe two or three times he asked me what was going on with the investigation, after he had given me his report.

Q. Do you recall what your response was to those inquiries?

A. I basically told him that I didn't know what was going on, which was actually the truth.

Q. Do you recall being interviewed by a

representative of the Advisory Committee on Judicial Conduct about this matter?

A. Yes.

Q. Do you recall when that interview took place?

A. The date, no, sir, not without something to refresh my recollection.

Q. Do you recall who interviewed you?

A. An investigator from the Judicial Ethics Board, I believe.

Q. Are you aware that the report produced by that investigator indicates that you advised him at that time that Mr. Haggerty came to you with this information in early November of '96?

A. Yes, I'm aware that the report says that.

Q. Do you have an explanation as to why the report says that?

A. When I was interviewed by him, it was already probably at least a year after this occurred. I wasn't shown anything to refresh my recollection about dates, and he might have even suggested to me that, you know, could it have been early November or whatever, and I said yes. I didn't know the date at that time.

Q. Just for the Court's benefit, could you testify now as to what your best recollection of events was as to when Mr. Haggerty came to you with this information?

A. Yes. Using C–9 to refresh my recollection, which is dated 11–27–96, this document was submitted to me, which is Mr. Haggerty's report, within the two days of his verbal reporting it to me.

MR. FLEMING: Thank you. No further questions.

\*       \*       \*       \*       \*       \*       \*       \*

CROSS–EXAMINATION BY MR. FLOOD:

Q. Mr. Tobin, when you took over as the acting chief, was there any announcement as to how long it was anticipated you would serve as the acting chief?

A. No.

Q. So it was up in the air. Correct?

A. Yes.

Q. It could have been for a week, could have been for two weeks, could have been for a month. Correct?

A. Yes.

Q. And it actually turned out to be approximately twelve or thirteen months?

A. I honestly thought it would be much shorter than it turned out to be.

Q. And you expected that it would be a very short period of time that you would serve as the acting chief. Correct?

A. Yes.

Q. And you were basically there because there was some controversy in determining who should be appointed the new chief from the ranks of the Lyndhurst Police Department.

A. I was there because of a complex situation where two officers were both appointed as in command of the department, in writing, which must have caused confusion to the officers. And when this was reported to the Attorney General's Office, they instructed the Prosecutor to take it over, take over the department.

Q. Were you aware that there were some very strong feelings in Lyndhurst in terms of certain camps were in favor of one candidate for the police, to be police chief, and other camps were in favor of someone else?

A. Absolutely.

Q. Now, were you aware of the fact that there was a lot of controversy concerning decisions that Paul Haggerty had made as to who the next chief of police should be?

A. Yes. He was one of the people who issued a written order.

Q. And were you aware that there was a group of people that, in your opinion, were very upset with the actions of Mr. Haggerty?

A. Yes.

Q. When you initially found out about this so-called bribe attempt, did you believe that Mr. Haggerty, there could have been an attempt to set up Mr. Haggerty because of the politics in town?

A. Mr. Haggerty told me that that night when he verbally reported it to me that he felt he was being set up.

Q. Well—

A. As time went on with certain events that occurred in town, I actually suspect that that could be correct.

Q. Well, are you aware of a Italian American Club in Lyndhurst that is located in the "hook" section of Lyndhurst?

A. Yes.

Q. And are you aware if any members of the Lyndhurst Police Department were affiliated with that Italian American Club?

A. Yes.

Q. Who, to the best of your recollection, were members of the Lyndhurst Police Department that were affiliated with that club?

A. Well, the most important one was one of the two contenders for the position of chief, and that was Deputy Chief Robert Giangeruso. It's my understanding that he was actually, had some standing in that club of higher authority, and that he had other members of the department were also members of the club.

Q. Do you know if Ciardella had any connection whatsoever with this particular Italian American Club?

A. It was—at some point I learned that he was a member of that club, or former member of that club.

Q. Do you recall an incident after—strike that. Do you recall an incident involving Deputy Chief Giangeruso attempting to obtain copies of any investigative reports that were prepared with respect to the attempt to bribe Paul Haggerty?

A. Yes.

Q. Please tell the panel what you recall with respect to those attempts.

A. What occurred was Deputy Chief Giangeruso went into the detective division which was commanded by Captain James O'Connor, who was the other contender, and demanded to see the case file on the investigation into the bribe attempt involving Mr. Haggerty and Judge Breslin. This occurred after the arrest of Mr. Ciardella and, in fact, that arrest was in the newspaper. Prior to that he didn't know about this investigation.

Q. Can you think of any reason as to why Giangeruso would have been interested in obtaining those reports?

A. No, I can't.

Q. Now, no question that Haggerty brought this bribe attempt to your attention. Correct?

A. Yes.

Q. Would it be also fair to say that when he reported this to you, he indicated that Judge Breslin was ready, willing and able to turn over the money to the Prosecutor's Office and cooperate with that investigation?

A. He told me that when he gave me his written report. In fact, that was in response to my question. When he verbally reported, I asked him that question, I said: Does the Judge still have it? Is he willing to give it to us and come forward and cooperate? And he said he would check with him.

\*    \*    \*    \*    \*    \*    \*    \*

Q. Now, can you give this panel any explanation, assuming that you reported it to Greco a couple days before November 27th, as to why it wasn't until the third week at the very earliest that your office contacted Judge Breslin to interview him?

A. No, I can't tell you why. I can tell you that I was aware of that'delay, and I was a little apprehensive about why it was taking so long. I definitely understood that there was a delay, but I didn't really participate in the investigation, I didn't know what they were doing, if they were pulling records, if they were doing a wire, or if they had to go down the Prosecutor, go down to Trenton, meet with the

Attorney General because of the sensitivity of the whole thing, I don't know. But I was getting a little apprehensive about why it took them so long also.

### III ·

The DRB's disbarment recommendation is based on its determination that Respondent violated *RPC* 8.4(c) and (d) in that he engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation," and engaged in conduct "prejudicial to the administration of justice." Although no such finding was made by the three-judge Panel, leaving to this Court the ultimate determination whether such *RPC* violations have been established by clear and convincing evidence, an examination of the Panel's findings reveals that the Panel focused almost exclusively on whether Respondent's conduct in not reporting the bribe attempt violated the *Code of Judicial Conduct.*

Preliminarily, we note an apparent inconsistency between the Panel's refusal to rely on any statements made by Ciardella to investigators or during his electronically recorded conversation with Haggerty—in view of Ciardella's unavailability for cross-examination—and the Panel's finding that Ciardella, and not Respondent, was credible in describing the meeting with Respondent on October 17, 1996. Notwithstanding Respondent's uncontradicted testimony that Ciardella came to his office without an appointment, handed him an envelope, and asked him to "give it to the Commissioner," the Panel's opinion states as follows:

> Ciardella and Respondent, on that Thursday, conversed generally regarding the contents of the manila envelope and Ciardella's purpose in presenting the envelope to Respondent. We find Ciardella would not have accumulated such a large amount of money and traveled all the way from Toms River without (1) explaining to Respondent at least generally the contents of the envelope; (2) explaining his intent and purpose in making the delivery to Respondent; and (3) *receiving assurances from Respondent that he would pass the manila envelope and its contents to Haggerty.* In sum, Ciardella chose Respondent to be the intermediary and delivered the money and application with some explanation—an explanation that made Respondent at least generally aware, at that time, of the bribery and its goal.
>
> In making these findings, we find implausible Respondent's testimony that the conversation lasted no more than one and one-half minutes and entailed only,

"Here's an application for the police department. Give it to the Commissioner." *At the same time, we elect not to rely substantively on the statements of Ciardella regarding his conversations with Respondent that are contained in either the electronically recorded January 5, 1997, conversation between Ciardella and Haggerty or in the statement Ciardella gave to the police.* (Emphasis added).

Because the Panel declined to rely on Ciardella's statements about his encounter with Respondent in view of his unavailability for cross-examination, its conclusion that Ciardella's version is more credible than Respondent's is troubling. Perhaps the Panel inferred that Ciardella's version is the more likely of the two, as a matter of common experience, but such an inference would not support a factual finding by clear and convincing evidence if, as the Panel states, it gave no substantive effect to Ciardella's testimony or statement.

After summarizing the relevant facts, the three-judge Panel observed that three facets of Respondent's conduct must be addressed:

(1) his acceptance of the manila envelope and knowledge of the bribe plan without promptly and independently notifying law enforcement officials;

(2) his propounding of a hypothetical question to Haggerty;

(3) his abdication to Haggerty of the responsibility to report the bribe plan to Acting Chief Tobin.

Concerning the first and third aspects of Respondent's conduct, the Panel found that his failure to report the bribe directly to law enforcement officials other than Haggerty violated Canon 1 (noting that a judge should personally observe high standards of conduct so that the integrity and independence of the judiciary may be preserved) and Canon 2A (noting that judges should act in a manner that promotes public confidence in the integrity and impartiality of the judiciary) of the *Code of Judiciary Conduct.*

Concerning Respondent's conduct of propounding a hypothetical question to Haggerty about the bribe, the Panel found that this was conduct

whereby a reasonably objective member of the public could conclude Respondent was testing the waters to determine whether Ciardella's plan could come to fruition, a testing that either implicated a hope of being able to share in one of the two small envelopes of money or, at the very least, a willingness to act as

intermediary in the transmission of the bribe money to Haggerty. We find, under either scenario, a reasonably objective member of the public could conclude that Respondent became an accomplice in Ciardella's plan.

Accordingly, the Panel found that because a reasonably objective member of the public could have concluded that Respondent was trying to determine Haggerty's receptivity to a bribe, his conduct violated "that aspect of Canon 2A that [states that] a judge should act at all times in a manner that promotes public confidence in the integrity of the judiciary."

Two aspects of the Panel's determination on that issue are significant. First, the Panel did not find that Respondent engaged in conduct involving "dishonesty, fraud, deceit or misrepresentation," the elements of an *RPC* 8.4(c) violation, but rather that a reasonably objective member of the public could so conclude. It is far from hairsplitting to observe that the Panel focused on the more general language of the Canons that implicate public confidence in the judiciary, and not on whether clear and convincing evidence supported a finding of Respondent's complicity in the bribery.

Second, no evidence in the record directly supports the Panel's finding—on which the DRB apparently relied—that Respondent was sounding out Haggerty's willingness to accept a bribe. That might be one of several plausible inferences that could be derived from the various evidentiary accounts of their conversation. However, both of the participants in the *single,* isolated conversation at LaCibeles Restaurant that could have implicated Respondent in the bribe plot firmly rejected any such suggestion. Respondent testified that he framed the question hypothetically in an attempt to protect his friend of twenty-five years standing. As he testified at his May 6, 1998 ACJC deposition:

> Because I didn't . . . I didn't want to get him involved, if I didn't have to. Because the guy's approaching us, even though he's telling me to give it to the Commissioner, I'm saying well why should I get him involved. I mean just deal with it myself here, rather than getting him involved, if I didn't have to.

Similarly, when Haggerty testified before the Panel, he flatly rejected the suggestion that Respondent was "testing the waters" to see if he would accept a bribe.

> Q. Now, when Judge Breslin came to the restaurant and told you about the application he had received from a client, did you think he was trying to bribe you or see if you were willing to accept any money to give some guy's son a job on the Lyndhurst Police Department?
>
> A. Absolutely not, because he knows me and has known me for a quarter of a century or more, he knows me better. No, absolutely not. He was looking for: What are we going to do about this?
>
> Q. Just so there's no misunderstanding with this panel, do you think there was any chance at all that Breslin was trying to see if you would take the money?
>
> A. Absolutely not.
>
> Q. Now, what do you think Breslin was attempting to do the first time he spoke to you at that restaurant?
>
> A. Looking for help, or maybe—I don't know. Looking for help, tip me off, what are we going to do about this crazy situation?
>
> Q. Now, you cut him off before he gave any more details. Correct?
>
> A. Yes, I did.

■ In short, the only participants in the conversation at the restaurant—Respondent and Haggerty—vigorously deny that Respondent was testing Haggerty's honesty. These were friends of long standing, who met for drinks after work two or three times a week, went to ball games together, and whose families were closely connected. Concededly, different inferences can be drawn from their respective and varying recollections of their conversation. One plausible interpretation is that Respondent may have been trying to verify that there had been no prior communication between Ciardella and his friend Haggerty of which he was unaware. Or, as Haggerty suggests, Respondent may have been looking to Haggerty for advice on how to deal with an awkward and compromising situation. Other, more nefarious, inferences also are plausible. But this Court does not disbar lawyers based only on inference. In our view, this record cannot fairly be read to provide clear and convincing evidence that Respondent was "testing the waters" to determine if his close friend was interested in a bribe.

The DRB apparently reached that conclusion, however, relying on the three-judge Panel's finding that "a reasonably objective member of the public could conclude" that Respondent was "testing the waters." The perception of the public, however, relates directly to the generalized standard of judicial behavior that transgresses the *Code of Judicial Conduct*, not the more specific standard implicated by an order of disbarment.

Moreover, in terms of the need for both Breslin and Haggerty to be wary of a purported bribe offer, Acting Chief Tobin's statement to the ACJC's investigators confirmed that the threat of a set-up was far from idle. According to the ACJC investigator Tonelli:

*Mr. Tobin believes that this incident was an attempted set-up by a group of people because of political reasons.* Tobin pointed out a few coincidences that are difficult to explain. The group of people belong to the local Italian/American Club that is located in "The Hook" section of Lyndhurst. According to Tobin, membership in that club includes Former Police Chief Scalese, Deputy Giangeruso, Mayor Stellato and other high ranking police officers and municipal officials. As you read in the first paragraph of this report, Former Chief Scalese and Deputy Giangeruso were not Haggerty's biggest fans. After the arrest of Ciardella, Deputy Giangeruso stormed in the detectives bureau and demanded a copy of the file in the Ciardella case. The detectives told him that they did not have a file and did not participate in the investigation of the matter. Giangeruso then stormed into Tobin's office and made the same demand. Tobin told him that the matter was handled by the prosecutor's office and that Giangeruso should go to their office and demand a copy of the file. Giangeruso quickly calmed down and kept his mouth shut. Tobin can think of no other reason why Giangeruso would be so interested in that case if he or his club were not involved. (Emphasis added).

In that context, that Respondent chose to inform Haggerty of the bribe attempt in the less than explicit conversational style characteristic of an old friendship is not surprising. Nor is it surprising that one of their primary concerns may have been to protect each other from the unsavory implications that inevitably are associated with an unsolicited bribe attempt.

The DRB, however, relying on the Panel's findings made in a different context, concludes that Respondent's single conversation with Haggerty provides clear and convincing evidence of complicity in a bribe attempt. It then relies on cases in which bribes actually were paid to conclude that Respondent must be disbarred.

However, unlike *In re Coruzzi*, 95 *N.J.* 557, 472 *A.2d* 546 (1984), *In re Hughes*, 90 *N.J.* 32, 446 *A.2d* 1208 (1982), or the other bribery cases cited by the DRB, no bribe was paid here. As the record reveals, after Haggerty informed Tobin in November 1996, of the bribe attempt by Ciardella, Tobin relayed the information to the Prosecutor's Office. A delay of at least one month ensued before the Prosecutor's staff contacted Respondent and requested him to appear for an interview. The money was then delivered promptly by Respondent to the Bergen County Prosecutor, and eventually was forfeited to pay Ciardella's fine imposed in connection with his conviction for attempted bribery.

## IV

Accordingly, after a painstaking review of the entire record we are unable to conclude that Respondent's participation in a bribery scheme was established by clear and convincing evidence. We therefore reject the DRB's disbarment recommendation based on its determination that Respondent violated *RPC* 8.4(c) and (d) in that he engaged in "conduct involving dishonesty, fraud, deceit or misrepresentation" and conduct "prejudicial to the administration of justice."

We also are in agreement with the DRB's dissenting member that, notwithstanding the three-judge Panel's reference to *RPC* 1.6, Respondent was not required, in his capacity as a member of the bar, to report Ciardella's bribe attempt to the proper authorities. *RPC* 1.6 provides in pertinent part:

(a) A lawyer shall not reveal information relating to representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraphs (b) and (c).

(b) A lawyer shall reveal such information to the proper authorities, as soon as, and to the extent the lawyer reasonably believes necessary, to prevent the client:

(1) from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to result in death or substantial bodily harm or substantial injury to the financial interest or property of another;

(2) from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to perpetrate a fraud upon a tribunal.

Accordingly, pursuant to *RPC* 1.6 a lawyer *must* reveal to proper authorities information reasonably believed necessary to prevent a client from committing an illegal or fraudulent act likely to result in death, substantial bodily harm, substantial injury to another's financial interest or property, or likely to result in perpetuating a fraud on a tribunal. Because none of the conditions triggering mandatory notification of proper authorities was present here, we conclude that Respondent, *as an attorney,* had no affirmative obligation to report the bribe attempt. Nevertheless, we would expect that most lawyers, in circumstances similar to those of Respondent, immediately would convey the relevant information to the County Prosecutor's office.

■ That said, we fully agree with the three-judge panel's conclusion that Respondent, in his judicial capacity, erred grievously in failing to report the bribe attempt immediately to law enforcement officials and that that failure constituted a violation of the provisions of the *Code of Judicial Conduct* cited by the Panel. For that serious infraction Respondent considered himself compelled to resign from his position as Judge of the Lyndhurst Municipal Court that he had held since 1978.

Although no such finding was made by the DRB majority, we also are persuaded that the record establishes by clear and convincing evidence a violation of *RPC* 1.2(e), which provides:

(e) When a lawyer knows that a client expects assistance not permitted by the *Rules of Professional Conduct* or other law, the lawyer shall advise the client of the relevant limitations on the lawyer's conduct.

However, in our view Respondent's failure to inform Ciardella explicitly of his refusal to participate in Ciardella's illegal scheme is understandable in view of the joint decision by Respondent and Haggerty to inform Acting Chief Tobin of the bribe attempt. In that context, a direct confrontation with Ciardella might have frustrated the subsequent efforts by the County Prosecutor's office to obtain evidence of Ciardella's criminal objectives.

In imposing discipline, our purpose always has focused on the protection of the public, and not on the punishment of lawyers. *In*

*re Pajerowski,* 156 *N.J.* 509, 521, 721 *A.*2d 992 (1998). The determination of appropriate discipline in this matter is difficult because the Disciplinary Review Board, in whom we entrust substantial responsibility in lawyer-disciplinary cases, has by a narrow margin recommended Respondent's disbarment. Because we are persuaded that the record does not contain clear and convincing evidence of Respondent's participation in a bribe attempt, that recommendation clearly is not appropriate. Nor is the three-year suspension recommended by the DRB minority appropriate, that recommendation having been based on the same substantive determination made by the majority. We conclude that the most serious violations established in this record by clear and convincing evidence are those found by the three-judge hearing panel, involving violations of Canons 1 and 2 of the *Code of Judicial Conduct,* and *Rule* 2:15–8(a)(6) that proscribes "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." For those violations, based primarily on Respondent's failure as a member of the judiciary to report promptly the bribe attempt, Respondent has been compelled to resign his judicial office. We regard that as severe and appropriate discipline for the violations found by the three-judge panel.

In our view, the remaining violation of *RPC* 1.2(e) that is established by clear and convincing evidence warrants discipline less severe than suspension. Accordingly, Respondent is hereby censured for that violation. Respondent shall reimburse the Disciplinary Oversight Committee for appropriate costs.

So ordered.

LaVECCHIA, J., dissenting.

This case requires the Court to consider whether respondent, James A. Breslin, Jr., having been found beyond a reasonable doubt to have engaged in conduct warranting his removal from the bench, should continue nonetheless to be a member of the bar. Because I find the majority's view of the facts of this case to place too much of a strain upon credibility, and because I believe that

the majority's disposition will jeopardize the public's trust in the integrity of the members of the legal profession, I respectfully dissent. I would disbar respondent.

I.

The Office of Attorney Ethics (OAE) brought this attorney-disciplinary matter before the Disciplinary Review Board (DRB), on a motion for reciprocal discipline. *R.* 1:20–14(b)(3). The DRB determined that respondent, a former judge of the Lyndhurst Municipal Court, was guilty of unethical conduct and should be publicly disciplined. There was no majority vote by the DRB on the form of discipline. Four members of the DRB voted to disbar respondent, three members voted to suspend him for three years, and one member voted for a public reprimand. The ninth member of the DRB abstained.

The disciplinary proceeding arose from conduct that formed the basis for a complaint issued by the Advisory Committee on Judicial Conduct (ACJC). The complaint alleged that respondent violated the *Code of Judicial Conduct* by his participation in the attempted bribery of a public official. Following a hearing pursuant to *Rule* 2:15–14, the ACJC filed a Presentment with the Court recommending the institution of removal proceedings.

An order to show cause and a complaint issued for respondent's removal. The complaint charged respondent with violating Canons 1 and 2A of the *Code of Judicial Conduct.* After respondent filed an answer, the matter was referred to a three judge panel. The panel conducted two days of hearings, and thereafter filed a report containing findings of fact and a recommendation that the Court remove respondent from judicial office.

In January 2000, the Court accepted the findings of the panel, accepted with prejudice respondent's resignation from the bench, and barred him from holding any future judicial office in this State. *In re Breslin,* 162 *N.J.* 190, 191, 742 *A.*2d 970 (2000). The DRB correctly noted in this matter that, pursuant to *Rule* 1:20–14(b)(3), the Court's final determination of judicial misconduct

conclusively established the facts on which this attorney discipline matter is based. *In re Yaccarino*, 117 *N.J.* 175, 183, 564 *A.*2d 1184 (1989). It is those facts found by the three judge panel beyond a reasonable doubt pursuant to *N.J.S.A.* 2B:2A–9, then, that must be considered in assessing the appropriateness of discipline and the severity of the sanction to be imposed. *In re Goldberg*, 109 *N.J.* 163, 167, 536 *A.*2d 224 (1988); *In re Conway*, 107 *N.J.* 168, 170, 526 *A.*2d 658 (1987).

Respondent was admitted to the Bar of the State of New Jersey in 1968. He was appointed a Judge of the Lyndhurst Municipal Court in 1978 and served until January 2000.

On October 17, 1996, respondent was approached in his law office by Joseph Ciardella, a former client. Ciardella had previously resided in Lyndhurst, but had relocated to Toms River. Ciardella came to respondent's Lyndhurst law office to elicit respondent's help in Ciardella's plan to bribe Paul Haggerty, the elected Director of Public Safety for Lyndhurst. Haggerty had the power to appoint the municipal judge as well as police department employees. Ciardella did not seek any legal assistance from respondent, but rather wanted his assistance to get Haggerty to appoint Ciardella's son to the Lyndhurst Police Department. Based on those facts the panel determined that "while Ciardella relied on the former lawyer-client relationship with respondent to gain access, he went to respondent because he was Lyndhurst's Municipal Judge."

At the meeting, Ciardella handed respondent an unaddressed, unsealed nine-by-twelve inch manila envelope containing his son's job application, which was only twenty-two pages in length. Also in the envelope were two bank cash envelopes, each bundle containing fifty $100 bills for a total of $10,000 in cash. As the panel described it, "[t]he contents of the envelope made it bulky and reasonably heavy."

The panel found that at that meeting Ciardella discussed with respondent, at least generally, the bribe and its goal. As stated by the panel:

Ciardella and Respondent, on that Thursday, conversed generally regarding the contents of the manila envelope and Ciardella's purpose in presenting the envelope to Respondent. We find Ciardella would not have accumulated such a large amount of money and traveled all the way from Toms River without (1) explaining to Respondent at least generally the contents of the envelope; (2) explaining his intent and purpose in making the delivery to Respondent; and (3) receiving assurances from Respondent that he would pass the manila envelope and its contents to Haggerty. In sum, Ciardella chose Respondent to be the intermediary and delivered the money and application with some explanation—an explanation that made Respondent at least generally aware, at that time, of the bribery and its goal.

In making these findings, we find implausible Respondent's testimony that the conversation lasted no more than one and one-half minutes and entailed only, "Here's an application for the police department. Give it to the Commissioner." At the same time, we elect not to rely substantively on the statements of Ciardella regarding his conversations with Respondent that are contained in either the electronically recorded January 5, 1997, conversation between Ciardella and Haggerty (C–3B, 3C) or in the statement Ciardella gave to the police (C–6). We make this election for three reasons: (1) Ciardella's apparent inability to testify before the Panel due to a mental impairment caused by a recent stroke; (2) the consequent inability of Respondent to cross-examine Ciardella; and (3) our consequent lack of opportunity to assess Ciardella's credibility.

Either that day or within the next two days, Respondent reviewed the contents of the manila envelope. He saw the $10,000 divided into two separate smaller envelopes. He then knew the exact extent of his former client's effort to bribe Haggerty.

Rather than report the bribery plan, respondent allowed several days to pass. He met Haggerty a few days later in a restaurant where frequently they socialized after work. He posed to Haggerty "a hypothetical question ... to get Haggerty's reaction to what he would do if a client of [respondent] offered Haggerty money to do a favor." Haggerty reacted angrily and ended conversation on the topic. Sometime during the next three weeks, Haggerty raised the issue again with respondent because the prior conversation continued to upset him. Haggerty inquired of respondent about the details of the plan, which respondent revealed. Respondent also identified his client when pressed to do so by Haggerty. When Haggerty asked him what was to be done with the manila envelope and its contents, respondent answered that he was waiting for a call from Ciardella. On November 26, 1999, Haggerty reported the plan to Lyndhurst's Acting Chief of Police, James Tobin. Haggerty did so at his own insistence, but with

respondent's knowledge. At no prior time had respondent attempted to report the plan.

Respondent explained his own failure to report the bribery plan to Acting Police Chief Tobin as "essentially due to the fact that he did not know, at the time, who was in charge of the Lyndhurst Police Department." The panel found that explanation to be "implausible." Tobin had been appointed Acting Chief in July 1996 and served in that capacity at all relevant times. The panel explained:

> The need for the Bergen County Prosecutor to appoint Tobin, then a Captain in the Prosecutor's Office, as Acting Chief arose after a well-publicized and highly controversial dispute over the successor to the retired Chief, John Scalese. Before retiring, the Chief had designated the Deputy Chief Robert Giangeruso as the person in charge of the Police Department. Haggerty, exercising his authority as Commissioner, named Lyndhurst Police Captain James A. O'Connor as Acting Chief. An ensuing impasse over department control and supervision led to intervention by the Attorney General and Tobin's appointment as Acting Chief. During the time between Ciardella's delivery of the manila envelope and his ultimate arrest on bribery charges, certain events occurred respecting Tobin's role as Acting Chief and Respondent's knowledge of Tobin's continuing presence in Lyndhurst. Tobin had constant contact with Haggerty. Respondent had constant social contact with Haggerty. Respondent met Tobin, who was introduced to Respondent as the Acting Chief, during Tobin's tenure in that capacity. Tobin from time to time appeared in the Municipal Court to observe while court was in session. Tobin had an office, which he constantly used, in the Municipal Building in close proximity to the Municipal Court. Respondent's son was a member of the Lyndhurst Police Department. We find, beyond a reasonable doubt, these facts demonstrate Respondent knew Tobin was Acting Chief of Police during the relevant time and was an available law enforcement official to whom he could report the bribe plan.

Ultimately, the panel found several reasons demonstrating Respondent's unfitness to serve as a judge.

> Three facets of Respondent's conduct must be addressed: (1) his acceptance of the manila envelope and knowledge of the bribe plan without promptly and independently notifying law enforcement officials; (2) his propounding of a hypothetical question to Haggerty; and (3) his abdication to Haggerty of the responsibility to report the bribe plan to Acting Chief Tobin.

> The first facet requires findings regarding Respondent's obligation as a municipal judge to report the bribe plan to law enforcement officials. *We find that as a municipal judge, Respondent, upon delivery of the manila envelope and a general knowledge of the purpose of its delivery and especially upon becoming aware of the entirety of Ciardella's bribe plan, had a duty under the Code of Judicial Conduct*

*to promptly report the matter to law enforcement officials.* · The failure to report the matter either to the Bergen County Prosecutor's Office, a failure for which Respondent proffered no reasonable explanation, or to Acting Chief Tobin, a failure for which Respondent also proffered no plausible explanation, we find beyond a reasonable doubt contravened Canon 1 and 2A and brought the Lyndhurst munici-pal judgeship into disrepute.

*The conduct of propounding the hypothetical question to Haggerty similarly transgressed the applicable Canons and Rule, particularly that aspect of Canon 2A that a judge should act at all times in a manner that promotes public confidence in the integrity of the judiciary.* Respondent initially addressed the matter with Haggerty in the context of a hypothetical question to get Haggerty's reaction to what Respondent knew, and Haggerty did not know, was Ciardella's bribe plan. *We find this conduct created a circumstance whereby a reasonably objective member of the public could conclude Respondent was testing the waters to determine whether Ciardella's plan could come to fruition, a testing that either implicated a hope of being able to share in one of the two small envelopes of money or, at the very least, a willingness to act as intermediary in the transmission of the bribe money to Haggerty.* We find, under either scenario, a reasonably objective member of the public could conclude that Respondent became an accom-plice in Ciardella's plan. Consequently, as to this facet, we find there can be no reasonable doubt Respondent's conduct violated both the Canons and the Rule. *Lastly, we find the fact Respondent elected to leave it to Haggerty to report the matter to Tobin was an equally serious transgression of the relevant standards governing judicial conduct.* We find the standards make no allowance for Respon-dent, as a Municipal Judge, to turn over his responsibility to report the Ciardella criminal plan to a lay person, who was an elected official not versed in the law, particularly when the report to the law enforcement official, by Haggerty and not by the Respondent, occurred more than a month after Respondent's total aware-ness of the bribe plans.

In sum, we find beyond a reasonable doubt, a plethora of conduct that demon-strates Respondent's unfitness to serve as the Judge of the Lyndhurst Municipal Court-an unfitness that warrants his removal from that office.

(emphasis added).

Both the hearing panel in the judicial removal action and the DRB in this attorney disciplinary proceeding duly noted that respondent provided a voluntary sworn statement to the Bergen County prosecutor's investigator and that respondent was not charged with any criminal conduct. Ciardella was charged with the second-degree offense of bribery of a public official, and ultimately pled guilty to violation of *N.J.S.A.* 2C:27–6b (third degree offense of a gift to a public official). He was fined $10,000.

The DRB held that respondent violated *R.P.C.* 8.4(c) (engage in conduct involving dishonesty, fraud, deceit or misrepresentation)

and (d) (engage in conduct that is prejudicial to the administration of justice). In so concluding, the DRB rejected respondent's argument that the facts were "susceptible of different interpretations." Respondent argued before the DRB that the record did not demonstrate that 1) his conduct was "knowingly and intentionally wrongful;" 2) that he "had improper motives;" 3) that he "entertained hopes of sharing the money in the envelopes he had been given;" or 4) that he acted as an intermediary for Ciardella. The DRB relied, however, on the panel's finding beyond a reasonable doubt that respondent's "intelligence and ability countervails any finding that his conduct ... can be characterized as simply unintelligent or dilatory in nature." In rejecting respondent's more innocent explanations for his behavior, the DRB found unbelievable his contention that negligence or bad judgment led to his misconduct.

On the subject of discipline, four members of the DRB stated that attorneys who commit serious misconduct while serving in public office are subject to "stringent discipline, normally disbarment[,]" citing *In re Boylan*, 162 *N.J.* 289, 293, 744 *A.2d* 158 (2000) and *In re Coruzzi*, 98 *N.J.* 77, 81, 484 *A.2d* 667 (1984). Irrespective of whether respondent's conduct involved his judicial position, those four members of the DRB determined that respondent's actions warranted disbarment, citing *In re Rigolosi*, 107 *N.J.* 192, 210, 526 *A.2d* 670 (1987) (disbarring attorney despite his acquittal on all criminal bribery charges arising from attempt to bribe state police officer to file false police report). Furthermore, respondent was perceived as exacerbating his misconduct by having lied to the panel. As noted, three other members voted to suspend respondent, and one member dissented by separate opinion.

## II.

A judge's authority reaches every corner of society, and because of the impact of that authority,

judges must be competent and ethical, and their actions must foster respect for their decisions as well as for the judiciary as a whole. Given that they hold

positions of considerable authority and are entrusted with a great deal of power and discretion, judges are expected to conduct themselves according to the high standards of professional conduct. Indeed, it is often said that judges are subject to the highest standards of professional behavior.

[Jeffrey M. Shaman, *Judicial Ethics*, 2 Geo. J. Legal Ethics 1 (1988).]

Lawyers who serve in the judiciary have a very visible dual professional responsibility that subjects them to the strictest adherence to both the disciplinary rules as attorneys, and the *Code of Judicial Conduct* as judges. See *In re Magid*, 139 *N.J.* 449, 455, 655 *A.*2d 916 (1995) ("Attorneys who hold public office are invested with a public trust and are thereby more visible to the public. Such attorneys are held to the highest of standards.").

In my view, an attorney must be disciplined for conduct while a judge "if the conduct itself corrupts the judicial process or evidences a lack of the character and integrity that are necessary in an attorney." *In re Boylan, supra*, 162 *N.J.* at 293, 744 *A.*2d 158. The conduct itself must be viewed from the perspective of an informed and concerned private citizen to determine "whether the reputation of the Bar would be lowered if the conduct were permitted." *In re Opinion No. 415*, 81 *N.J.* 318, 325, 407 *A.*2d 1197 (1979). That concern for the image of the bar is integral to public respect for the integrity of the administration of justice:

There are certain acts by attorneys that so impugn the integrity of the legal system that disbarment is the only appropriate remedy. *In re Hughes*, 90 *N.J.* 32, 37, 446 *A.*2d 1208 (1982); *In re Wilson*, 81 *N.J.* 451, 453, 409 *A.*2d 1153 (1979). These include, for example, any attempt to corrupt the judicial process by an attorney suborning perjury or tampering with witnesses to fix a case, *In re Conway, supra*, 107 *N.J.* at 170, 526 *A.*2d 658, or assisting others in such efforts, *In re Rigolosi*, 107 *N.J.* 192, 208, 526 *A.*2d 670 (1987), or bribing a police officer, *In re Hyett*, 61 *N.J.* 518, 537, 296 *A.*2d 306 (1972), or bribing a public official, *In re Tuso*, 104 *N.J.* 59, 64–65, 514 *A.*2d 1311 (1986), or bribing an I.R.S. agent, *In re Hughes, supra*, 90 *N.J.* at 36, 446 *A.*2d 1208, or by a judge accepting a bribe and not sentencing defendant according to the law, *see In re Coruzzi*, 98 *N.J.* 77, 80, 484 *A.*2d 667 (1984). "Misconduct of this stripe conclusively renders the wrongdoer unworthy of the profession." *In re Conway, supra*, 107 *N.J.* at 182, 526 *A.*2d 658.

[*In re Boylan, supra*, 162 *N.J.* at 293, 744 *A.*2d 158.]

Bribery is one of the more serious offenses an attorney can commit. *In re Callahan*, 70 *N.J.* 178, 184, 358 *A.*2d 469 (1976). A

judge's participation *in any aspect* of a bribery scheme is inexcusable.

> We hold that a judge who accepts a bribe must be removed from office. There can be no exceptions whatsoever. One might argue that there might conceivably be some bribery case somewhere with mitigating circumstances sufficient to justify discipline other than removal. That case will have to be argued elsewhere. In New Jersey nothing other than removal will do, no matter what the circumstances.
> [*In re Coruzzi*, 95 *N.J.* 557, 566, 472 *A.*2d 546 (1984).]

Even if the attorney offender does not "act for personal greed or financial gain, and the mitigating factors [are] substantial, [the Court has] found that the only appropriate discipline for bribery of a public official [is] disbarment." *In re Jones*, 131 *N.J.* 505, 513, 621 *A.*2d 469 (1993); *In re Hughes, supra*, 90 *N.J.* at 36–37, 446 *A.*2d 1208 (1982) (stating that although "it is unlikely that the attorney will repeat the misconduct, certain acts by attorneys so impugn the integrity of the legal system that disbarment is the only appropriate means to restore public confidence in it. Bribery ... is surely one of those cases.... No sanction short of disbarment will suffice....").

In the past, the Court has disbarred attorneys for even collateral involvement in the bribery of public officials. *See, e.g., In re Rigolosi, supra*, 107 *N.J.* at 208, 526 *A.*2d 670 (disbarring attorney for attorney's involvement in bribery scheme notwithstanding attorney's acquittal of bribery); *In re Conway*, 107 *N.J.* 168, 182, 526 *A.*2d 658 (1987) (disbarring attorney convicted of participating in conspiracy to secure dismissal of criminal prosecution by bribing witness); *In re Coruzzi, supra*, 95 *N.J.* at 581–82, 472 *A.*2d 546 (disbarring judge on conviction of four counts of bribery when judge either received the money or solicited the bribe but did not receive the money); *In re Hughes, supra*, 90 *N.J.* at 39, 446 *A.*2d 1208 (disbarring attorney convicted of bribing IRS agent to remain silent concerning possible criminal violations and to alter certificates of release of federal tax liens); *In re Sabatino*, 65 *N.J.* 548, 554, 324 *A.*2d 20 (1974) (disbarring attorney convicted of conspiracy to bribe public official); *In re Colsey*, 63 *N.J.* 210, 215, 306 *A.*2d 72 (1973) (disbarring attorney for aiding participants in payment of suspect political contributions); *In re Goode*, 58 *N.J.*

420, 421, 278 A.2d 206 (1971) (disbarring attorney convicted of conspiracy to bribe police officer). In *Rigolosi*, after conducting an independent review of the record, the Court disbarred an attorney acquitted of bribery. 107 *N.J.* at 208, 526 A.2d 670. Although the Court found that the attorney did not know of, assist, or encourage the bribery scheme in advance, the Court determined that the attorney's conduct extending over a period of months, placed him "if not in the center, alongside those in the web of deceit." *Id.* at 197, 526 A.2d 670. The Court held that the attorney's conduct required his expulsion from the ranks of the legal profession:

This is not a case of a novice who had not yet had opportunity to develop a sense of ethics. Respondent was an attorney steeped in the ways of law, government, and politics. No amount of good works can save someone who, with all the knowledge and experience that he accumulated, "poisons the well of justice."

[*Id.* at 210, 526 A.2d 670.]

### III.

Both the OAE and respondent invoke comparison of this case to *In re Rigolosi, supra.* Respondent contends that disbarment was imposed in *In re Rigolosi* because the Court had clear evidence in the record that the attorney played a sinister part in the attempt to bribe a state trooper; he was "not just an innocent bystander or dupe." *Id.* at 208, 526 A.2d 670. Here, respondent asserts that the record fails to establish clear and convincing evidence of similar involvement by him in Ciardella's effort to bribe Haggerty. Rather, he contends that the record permits varying inferences, and therefore lacks the clear and convincing proof necessary to place him in the status of "participant" in Ciardella's scheme.

On the other hand, the OAE contends that the decision in *In re Rigolosi* compels disbarment here. As in *Rigolosi*, respondent may not have contrived the plan, but his involvement was significant because he demonstrated a "willingness to act as an intermediary" by posing the hypothetical question to Haggerty. The OAE also contends that, like Rigolosi, respondent's involvement was not limited to a single instance, but spanned a period exceed-

ing a month during which he had the opportunity to prevent the bribe from taking place but did not do so. During that month he received the bribe money, posed his hypothetical question to the target of the bribe and did not report Ciardella's actions in furtherance of a bribe to *any* member of law enforcement. It was Haggerty who reported the matter, at his insistence, not respondent's, to Tobin on November 26, 1999. The OAE asserts that respondent's conduct is reasonably regarded as actions in furtherance of the bribe effort.

The task here is to determine whether based on the record developed in the judicial removal action brought against respondent, the evidence is clear and convincing that he engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, *R.P.C.* 8.4(c), and that is prejudicial to the administration of justice, *R.P.C.* 8.4(d). Like the DRB, I reject respondent's contention that the facts are subject to competing interpretations and that respondent's conduct could ever be characterized as innocent. Rather, my review of the record leads me to the conclusion that respondent has engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation, and that the conduct is prejudicial to the administration of justice. Applying the principles of *Rigolosi*, disbarment is appropriate.

The record before the hearing panel on judicial removal is compelling. Employing the high beyond-a-reasonable-doubt standard of proof, the panel rendered several important findings. First, respondent had a general knowledge on October 17, 1996 of the purpose of Ciardella's delivery to him of the manila envelope containing a job application and $10,000 to be provided to Haggerty. The panel also determined that either on October 17, 1996 or within a day or two thereafter, respondent had actual knowledge of the entirety of Ciardella's bribe plan that involved him as intermediary in the delivery of the cash and job application to Haggerty. The panel found beyond a reasonable doubt that that knowledge imposed a duty on respondent to report the matter to law enforcement. He failed to do so, and upon viewing respon-

dent's demeanor and overall credibility when he testified, the panel pronounced his various explanations as not reasonable and not plausible. The panel held that respondent's failure to report the bribery scheme violated Canons 1 and 2A of the *Code of Judicial Conduct* beyond a reasonable doubt and, in a very public way, brought the Lyndhurst municipal judgeship into disrepute.

Second, the panel found beyond a reasonable doubt that respondent failed to act in a manner that would promote public confidence in the integrity of the judiciary when he hypothetically asked Haggerty, the very target of the bribe scheme, how he would react if a client of respondent's asked him to do him a favor. That type of action by a member of the bar, and a judicial officer, is corrosive to the public's confidence in the administration of justice. The panel correctly perceived the devastating effect of respondent's behavior. Fairly regarded, respondent's conduct and words can only be reasonably viewed as a testing of the waters to see how Haggerty would respond. Respondent evidenced his willingness to act as an intermediary in furtherance of the bribery effort. The panel found, under the rigorous beyond-a-reasonable-doubt standard, that respondent's conduct reasonably was viewed as rendering him an accomplice to the bribery plan. That finding amply supports, indeed compels, a clear and convincing finding that respondent engaged in conduct implicating him in a bribery scheme. Thus, the misconduct implicated deceit and it was prejudicial to the administration of justice, violations of *R.P.C.* 8.4(c) and (d).

The majority quotes verbatim some forty-eight pages of the record in an effort to establish that there is a plausible, innocent explanation for respondent's posing that hypothetical question to Haggerty. The majority posits that respondent may have been looking to Haggerty for advice on "how to deal with an awkward and compromising situation." *Ante* at 289, 793 *A.*2d 645. I must respectfully disagree.

There is no plausible, innocent explanation for respondent's conduct. He plainly was testing the waters to ascertain Hagger-

ty's receptivity to an offer of a bribe. To me, there is not another credible explanation. If respondent truly believed that Haggerty could not be bought, why pose the question to admit that possibility? If respondent truly was trying to report the incident to Haggerty as his supervisor, why did he not report the details of the scheme to him in that conversation? Why did he not report the scheme to law enforcement? Why did he not tell Haggerty the details until much later, and then only at Haggerty's insistence? In that initial conversation with Haggerty, respondent was not asking Haggerty "what should I do," he asked Haggerty "what would you do?" There was nothing innocent about respondent's hypothetical inquiry of Haggerty; it was designed to test Haggerty. By so doing, respondent implicated himself in the bribery scheme in violation of *R.P.C.* 8.4(c) and (d).

This is not only one of many possible reasonable inferences to be drawn from the facts. The essential facts here are not in dispute. Respondent does not contest that Ciardella came to his office and gave him a manila envelope containing a police application for his son and two thick bundles of cash to be delivered to Haggerty. He does not dispute that, within a day or so thereafter at the latest, he knew exactly what was in that envelope and understood what Ciardella wanted him to do with it. It is also undisputed that a few days later he met Haggerty and posed a hypothetical question to him, asking Haggerty what he would do if a client of respondent's offered Haggerty a bribe. He did not go into the details of the bribery plan with Haggerty at that meeting, either before or after the posing of that hypothetical question. He did not report the bribery scheme to law enforcement. It was reported, later, by Haggerty. Those facts are uncontested. Respondent, through his testimony "explaining" those facts, asks us to accept different inferences. The three judge panel found those inferences to be implausible. They called his explanation for his conduct "incredible." I agree.

Respondent's proffered inferences do not have to be accepted merely because he testified to them. The inferences he asks us to

accept have to be reasonable to be accepted. Unfortunately, there is only one reasonable inference that flows from these facts and that is that respondent implicated himself in a bribery scheme. Respondent's proffered explanation, in contrast, is simply implausible. We accept the natural, plausible inferences that flow from incontestable fact; we need not accept implausible fiction as competing inferences. *Ciuba v. Irvington Varnish & Insulator Co.*, 27 *N.J.* 127, 139–40, 141 *A.*2d 761 (1958) ("The determinative inquiry is whether the evidence demonstrates the offered hypothesis as a rational inference, that is to say, a presumption grounded in a preponderance of the probabilities according to the common experience of mankind."). Nor must we have competing testimony to reject the patently incredible inference that respondent wants us to accept. See *Mayflower Indus. v. Thor Corp.*, 15 *N.J.Super.* 139, 162, 83 *A.*2d 246 (Ch.Div.1951), *aff'd o.b.*, 9 *N.J.* 605, 89 *A.*2d 242 (1952) ("What a person's intentions were need not be proved from what he said, but they may be inferred from all that he did and said, and from all the surrounding circumstances of the situation under investigation.").

The three judge panel looked at the same facts as we have before us and concluded that respondent was guilty beyond a reasonable doubt of conduct that was prejudicial to the administration of justice that required his removal from the bench. They viewed respondent on the stand, heard his same arguments for the same inferences to explain his conduct, and rejected those explanations as incredible. Indeed, his testimony was reported as not believable for multiple reasons. In addition to rejecting the substance of the explanation respondent was proffering, respondent himself was characterized as a less than candid witness. His changing versions of what transpired between Haggerty and him also rendered his testimony disingenuous. There is no credible basis from which to dispute the soundness of the panel's findings. An explanation that is offered for conduct that is conceded may be so disingenuous that it may permit an inference that bad motive was intended. Respondent's explanation sinks to such depths.

Moreover, the three judge panel found beyond a reasonable doubt that the public, on hearing all of the facts, would believe that respondent had participated in a bribe. Another way of characterizing that finding, made beyond a reasonable doubt, is that the commonly accepted inference that flows from the conduct conceded here is that respondent participated in the bribery scheme by testing the waters with the police commissioner. So when respondent says that there is another plausible inference to draw from these facts, that assertion runs directly contrary to the finding of the three judge panel in the prior judicial removal proceeding.

Finally, it is no response to argue that respondent was not charged with a criminal offense. We do not know, and will never know, why the prosecutor exercised his discretion as he did in this matter. But we do know that when judicial removal charges were prosecuted against respondent, a three judge panel, employing the beyond-a-reasonable-doubt standard, determined that respondent acted in a manner prejudicial to the administration of justice, and that that conduct brought his judicial office into disrepute.

Respondent's misconduct strikes at the heart of our attorney disciplinary system's goal: to promote public confidence in the integrity of the administration of justice. That a longtime member of the bench and bar knew a criminal scheme was afoot and that he was asked to play an integral part in its fruition, and yet did not report it to law enforcement, is poison in the well of justice. Respondent's actions, objectively regarded as being in furtherance of the criminal endeavor, reveal a corruption, or indifference to corruption, that are a violation of the professional fealty that respondent owed to the administration of justice. Disbarment is necessary and appropriate. The public should be reassured that an attorney who engages in such conduct will never again be trusted with the responsibilities of being a lawyer. In my view, respondent's conduct violates *R.P.C.* 8.4(c) and (d) and renders him unfit to practice law. I respectfully dissent.

Chief Justice PORITZ and Justice COLEMAN join in this dissent.

*For censuring*—Justices STEIN, LONG and VERNIERO, and Appellate Division Judge KING (temporarily assigned)—4.

*For disbarring*—Chief Justice PORITZ and Justices COLEMAN, and LaVECCHIA—3.

## O R D E R

It is ordered that **JAMES A. BRESLIN, JR.,** of **LYN-DHURST,** who was admitted to the bar of this State in 1968, is hereby censured; and it is further

ORDERED that respondent reimburse the Disciplinary Oversight Committee for appropriate administrative costs incurred in the prosecution of this matter.